60 Cal.Rptr.3d 375 (2007)
151 Cal.App.4th 267
FASSBERG CONSTRUCTION COMPANY, Plaintiff, Cross-defendant and Appellant,
v.
HOUSING AUTHORITY OF the CITY OF LOS ANGELES, Defendant, Cross-complainant and Appellant.
No. B181989.
Court of Appeal of California, Second District, Division Three.
May 24, 2007.
As Modified on Denial of Rehearing June 21, 2007.
*382 Horvitz & Levy, Frederic D. Cohen, Daniel J. Gonzalez and Dean A. Bochner, Encino, for Plaintiff, Cross-defendant, and Appellant.
Rockard J. Delgadillo, City Attorney, Claudia McGee Henry, Assistant City Attorney, and Gerald M. Sato, Deputy City Attorney, for Defendant; Cross-complainant and Appellant.
CROSKEY, J.
Fassberg Construction Company (Fassberg) appeals a judgment, after a jury trial, denying it relief on its complaint and awarding the Housing Authority of the City of Los Angeles (Housing Authority) $3,960,500, exclusive of costs, on its cross-complaint. The action arises from a construction contract between the Housing Authority as owner and Fassberg as general contractor. The jury found that Fassberg breached the contract, that Fassberg knowingly submitted 2,983 "false claims" to the Housing Authority, and that the Housing Authority suffered $1,104,000 in damages resulting from the breach of contract and $455,000 in damages resulting from the false claims. The court trebled the latter figure and awarded a civil penalty of $500 per false claim pursuant to the California False Claims Act (Gov.Code, ง 12650 et seq.). The jury also found Fassberg liable for intentional misrepresentation and awarded the Housing Authority $1,559,000 in compensatory damages and $1,200,000 in punitive damages.
The court concluded that the punitive damages award duplicated the treble damages award and civil penalty, and required an election of remedies. The Housing Authority elected to recover damages for breach of contract, treble damages for false claims, and the civil penalty. The *383 court refused to reduce the judgment by the 10 percent of the contract price that the Housing Authority retained pursuant to the contract and continues to withhold. Both parties appealed.
Fassberg challenges the civil penalty and treble damages award for false claims, contending the evidence does not support the findings that it submitted 2,983 false claims and that the Housing Authority suffered $455,000 in damages as a result. Fassberg also challenges the amount of damages awarded for breach of contract, the awards of compensatory and punitive damages for misrepresentation, and the denial of a setoff for the retention proceeds. The Housing Authority challenges the required election of remedies, contending it is entitled to recover punitive damages in addition to the amounts awarded in the judgment. The Housing Authority also challenges the denial of its motion for expert witness fees based on a statutory offer to compromise.
We conclude that the California False Claims Act authorizes an award of treble damages for knowingly presenting either "a false claim" or "a false record or statement" for payment or approval of a false claim, but authorizes a civil penalty only for each false claim. Weekly payroll reports submitted in support of requests for payment on a construction contract and change order proposals requesting adjustments in the contract price may be false records or statements presented for payment or approval of a claim, but are not "claims" under the act and alone cannot support a civil penalty. Moreover, the measure of damages for false claims is the amount of injury proximately caused by the false claims. That amount does not include a shortfall in the payment of prevailing wages to workers if the underpayment did not increase the cost or result in any loss to the public agency.
Our principal holdings are that (1) the evidence does not support the finding of 2,983 false claims and does not establish a sufficient basis for the civil penalty; (2) the evidence does not support the finding that the Housing Authority suffered $455,000 in damages for false claims and does not support the treble damages award; (3) the damages awarded for breach of contract are excessive; (4) the award of compensatory damages for misrepresentation is not supported by substantial evidence; and (5) the court properly required an election of remedies by the Housing Authority. We also hold that Fassberg failed to demonstrate error with respect to the trial court's ruling on its claim for damages due to delay; Fassberg is entitled to recover the retention proceeds; and the denial of the Housing Authority's motion for expert witness fees based on the statutory offer to compromise was error. We will therefore reverse the judgment in part with directions. We also will affirm the judgment as to the denial of relief to Fassberg on its complaint and affirm the denial of Fassberg's motion for partial judgment notwithstanding the verdict with respect to the award of damages for false claims.

FACTUAL AND PROCEDURAL BACKGROUND

1. Construction Contract

The Housing Authority is a public agency that provides affordable housing to low-income persons. Fassberg is a general contractor. The Housing Authority and Fassberg entered into a contract dated April 5, 2000, providing for Fassberg to build 25 residential buildings, comprising 156 dwelling units, and a maintenance building. The total contract price was $12,863,690. The construction was to be completed within 270 days after a notice to proceed. The contract provided for liquidated *384 damages payable to the Housing Authority in the amount of $1,500 per day if Fassberg failed to timely complete the work.
The contract provided for periodic progress payments based on Fassberg's estimates of the value of work performed under the contract, subject to approval by the Housing Authority. Fassberg agreed to submit with each request for progress payment a certification that the amounts requested were for performance in accordance with the contract specifications, that payments to subcontractors and suppliers had been made from previous progress payments received, and that timely payments would be made from the requested progress payment. The contract provided for the Housing Authority to "retain ten (10) percent of the amount of progress payments until completion and acceptance of all work under the contract." The Housing Authority agreed to make the final payment due to Fassberg under the contract after (1) the completion and final acceptance of all work under the contract, and (2) the receipt of a release of all claims against the Housing Authority arising by virtue of the contract, with the exception of any claims clearly specified by Fassberg in amount and nature, as to which claims Fassberg could not request final payment.
Fassberg agreed to pay prevailing wages and benefits at rates determined by the United States Secretary of Labor. Fassberg also agreed to submit weekly payroll reports stating the classification of and hourly wages paid to each worker and other information, together with a certification signed by Fassberg or the subcontractor responsible for paying the worker confirming that the information provided was correct and complete and that each worker was paid not less than the applicable wage rate and benefits. The contract stated that the falsification of any certification could subject Fassberg to civil or criminal prosecution.
The contract stated that the Housing Authority could issue a change order at any time altering the scope of work. If a change order caused an increase or decrease in either the cost of construction or the time to perform the contract, the Housing Authority was required to "make an equitable adjustment and modify the contract in writing." The contract also provided that if any written or oral order by the Housing Authority resulted in a change in the scope or duration of work, Fassberg could make a "written proposal for equitable adjustment" with an itemized breakdown of increases and decreases in its direct costs, indirect costs, and profit. The Housing Authority agreed to "act on proposals within 30 days after their receipt, or notify the Contractor of the date when such action will be taken." The parties refer to proposals for equitable adjustment as change order proposals. The contract also stated that if the Housing Authority caused a delay in the work for an unreasonable period of time resulting in an increase in the cost to perform the work, Fassberg was entitled to additional compensation.

2. Contract Performance

The Housing Authority issued a notice to proceed with construction beginning May 15, 2000. The Housing Authority hired a construction management company, Dugan & Associates Construction Management (Dugan), a few weeks later. The construction project experienced delays due to changes made by the Housing Authority in the plans and specifications, faulty construction by Fassberg and its subcontractors, understaffing by Fassberg and its subcontractors, and other reasons. The first change order, issued on April 23, 2001, extended the contract performance *385 period by 167 days with no change in the contract price. The Housing Authority later agreed to other time extensions.
Fassberg submitted approximately 224 change order proposals to modify the contract price due to changes in the work or to extend the time for contract performance, including both proposed price increases due to additional work and proposed price decreases due to deleted work.[1] The Housing Authority determined that many of the proposed price increases were excessive and that some of the work for which Fassberg requested a price increase was already included in the contract scope of work or in a prior change order proposal. The contract required the Housing Authority to "act on [change order] proposals within 30 days after their receipt, or notify the Contractor of the date when such action will be taken." In practice, however, the Housing Authority often took much longer to respond to Fassberg's change order proposals, sometimes because Fassberg had failed to submit required information and sometimes because the Housing Authority failed to process the proposals in a timely manner.
The Housing Authority sometimes orally approved changes in the scope of work and asked Fassberg to submit a change order proposal later. After Fassberg submitted a change order proposal, the Housing Authority could determine whether the proposed increase in the contract price was reasonable and either agree to the proposal or agree to pay a lower price. Both parties understood that a change order proposal must be approved and the Housing Authority must issue a written change order before Fassberg could request payment for work encompassed in a change order proposal. The Housing Authority sometimes approved change order proposals but delayed issuing written change orders until after the funds to pay for the additional work were available to the Housing Authority, at which time it would issue a change order encompassing several change order proposals. There were approximately 70 change order proposals for which the Housing Authority determined that Fassberg was entitled to a total of $402,717.95, but for which the Housing Authority never issued a written change order and never paid Fassberg.[2]
The work was substantially completed on July 19, 2002, after 795 days. Fassberg submitted a total of 49 requests for progress payment during the course of construction, and the Housing Authority paid Fassberg a total of $11,790,328.26 for work on the project. After the completion of work and the Housing Authority's final acceptance of the work, the Housing Authority refused to release any part of the retention proceeds totaling $1,310,036.47. The Housing Authority determined that it was entitled to a credit in the amount of $677,932.77 for changes in the scope of work, and so informed Fassberg in a letter dated April 4, 2003.

3. Complaint, Cross-complaint and Offer to Compromise

Fassberg filed a complaint against the Housing Authority in February 2003. The *386 first amended complaint filed in April 2003 alleges that the Housing Authority breached its obligations under the contract to provide adequate plans and specifications, provide reasonable access to the construction site, timely respond to requests for information by Fassberg and its subcontractors, timely respond to Fassberg's change order proposals, and make timely progress payments. Fassberg also alleges that the Housing Authority breached its obligation under Public Contract Code section 7107 to timely release the retained funds.[3] The complaint alleges counts for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Public Contract Code section 7107.
The Housing Authority filed a cross-complaint against Fassberg. The first amended cross-complaint alleges that Fassberg breached its obligations under the contract to timely complete the work and to comply with the applicable wage and labor standards, among other alleged breaches. The Housing Authority also alleges that Fassberg violated the California False Claims Act by knowingly presenting false claims for payment, including change order proposals, requests for partial payment, and certified payroll records. The cross-complaint also seeks declaratory relief to establish a right to withhold from the final contract payment the entire retention amount. The cross-complaint alleges counts for breach of contract, violation of the California False Claims Act, intentional and negligent misrepresentation, fraudulent inducement, and declaratory relief. In its answer to the cross-complaint, Fassberg alleges that any liability to the Housing Authority should be reduced by the amounts that the Housing Authority owes Fassberg.
The Housing Authority served an offer to compromise (Code Civ. Proc., ง 998) in October 2004 offering to pay Fassberg $1,100,000 in exchange for a mutual release of claims and mutual dismissals with prejudice of this litigation. Fassberg did not accept the offer.

4. Trial, Verdict and Judgment

The case proceeded to a jury trial. Michael Hostettler, an expert witness for the Housing Authority, testified that his review of the certified payroll records, change order proposals, and requests for progress payments, submitted by Fassberg to the Housing Authority revealed 2,964 incidents of underpayment of wages reflected in payroll records, 948 incidents of "questionable charges" stated in change order proposals, and 47 incidents of overstatement of the percentage of work completed stated in requests for progress payments. He stated that the sum of those figures, 3,959, was the total number of "incidences of irregularities and otherwise nondocumented claims by the contractor." The Housing Authority's counsel stated in closing argument that each of those incidents was a "false claim" under the California False Claims Act.
The jury returned a special verdict in favor of the Housing Authority on all counts submitted to the jury except the Housing Authority's count for fraudulent inducement. The jury found that the Housing Authority did not breach the contract or the implied covenant of good faith and fair dealing, and that the Housing *387 Authority did not wrongfully withhold any part of the retention funds. The jury found that Fassberg breached the contract and the Housing Authority suffered $1,104,000 in resulting damages, that Fassberg knowingly submitted 2,983 false claims resulting in $455,000 in damages to the Housing Authority, that Fassberg intentionally and negligently misrepresented material facts, and that the Housing Authority suffered $1,559,000 in damages resulting from the misrepresentations. The jury found that the total amount of recoverable damages, eliminating any double recovery, was $1,559,000. The jury also found that Fassberg acted fraudulently and awarded the Housing Authority $1,200,000 in punitive damages in the second phase of trial.
The court imposed a civil penalty of $500 per false claim (Gov.Code, ง 12651, subd. (a)), totaling $1,491,500, and trebled the award of damages for false claims (ibid.), resulting in a treble damages award of $1,365,000. The court required the Housing Authority to elect to recover either the compensatory damages awarded by the jury for intentional and negligent misrepresentation ($1,559,000) plus punitive damages ($1,200,000) or compensatory damages for breach of contract ($1,104,000) plus treble damages for false claims ($1,365,000) plus the civil penalty ($1,491,500).[4] The Housing Authority elected the latter recovery, totaling $3,960,500. The court entered a judgment in February 2005 awarding the Housing Authority that amount and denying Fassberg any relief on its complaint. The judgment did not address the Housing Authority's count for declaratory relief concerning the retention proceeds or Fassberg's affirmative defense of setoff.

5. Posttrial Motions and Corrected Judgment

The Housing Authority moved for an award of attorney fees under Public Contract Code section 7107 and moved to recover its expert witness fees under Code of Civil Procedure section 998. The court found that the Housing Authority was the prevailing party on Fassberg's count for violation of Public Contract Code section 7107 and awarded the Housing Authority $886,500 in attorney fees under subdivision (f) of that statute.[5] The court determined that the scope of the requested release was overbroad and therefore denied the motion for expert witness fees.
Fassberg moved to vacate the judgment (Code Civ. Proc., ง 663) requesting an equitable setoff and a declaration of the parties' rights and duties with respect to the retention proceeds. Fassberg also moved for a partial judgment notwithstanding the verdict arguing that the finding that the Housing Authority suffered $455,000 in damages resulting from false claims was not supported by the evidence and was contrary to a jury instruction, and that the judgment should be reduced by the amount of the retention. In addition, Fassberg moved for a new trial arguing the same points, and also argued that the finding that the Housing Authority did not *388 breach the contract was contrary to the evidence, that the Housing Authority breached the contract by failing to pay Fassberg $402,717.95 for work done pursuant to approved change order proposals and by failing to compensate Fassberg for 116 days of delay caused solely by the Housing Authority, and that the award of $1,104,000 in damages for breach of contract was excessive.
The court granted Fassberg's motion to vacate in part and denied it in part, finding that Fassberg was not entitled to a setoff but was entitled to a declaration of rights and duties with respect to the retention proceeds. The court concluded that the Housing Authority was entitled to withhold the retention proceeds more than 60 days after the date of completion because there was a dispute between the parties at that time, pursuant to Public Contract Code section 7107, subdivision (c) (see fn. 3, ante). The court distinguished that question from the question whether Fassberg was entitled to a reduction of the judgment by the amount of the retention proceeds, and concluded that Fassberg had failed to assert the right to such a setoff either at trial or in an appropriate posttrial motion. The court denied Fassberg's motion for partial judgment notwithstanding the verdict based in part on the same reason, and stated that the determination of a setoff would require an evidentiary trial that, "if appropriate at all," should be conducted in a separate action for an equitable setoff. The court also denied Fassberg's new trial motion.
The court entered a corrected judgment in March 2005 stating that Fassberg "is not, in this action, entitled to an offset against the Housing Authority's recovery," and awarding the Housing Authority $886,500 in attorney fees. The corrected judgment otherwise is substantially the same as the original judgment.

6. Appeals

Fassberg filed a notice of appeal from the corrected judgment, the partial denial of its motion to vacate the judgment, the denial of its motion for partial judgment notwithstanding the verdict, and the attorney fee order. The Housing Authority filed a notice of appeal from the corrected judgment.

CONTENTIONS
Fassberg contends (1) neither the weekly payroll reports nor the change order proposals were "claims" within the meaning of the California False Claims Act for purposes of a civil penalty; (2) the evidence does not support the implied finding that Fassberg prepared, certified, or submitted the payroll reports; (3) the Housing Authority's expert and the jury improperly counted each alleged misstatement in a payroll report or change order proposal as a false claim; (4) the evidence does not support the finding that the purported claims were false; (5) the evidence does not support the finding that Fassberg knowingly presented the purported false claims; (6) the evidence does not support the award of $455,000 in damages for false claims, and the award is contrary to a jury instruction; (7) the Housing Authority breached the contract by refusing to issue a change order for and pay $402,717.95 that it admittedly owed, and the award of damages for breach of contract is excessive in that amount; (8) the Housing Authority breached the contract by failing to compensate Fassberg for 116 days of delay caused solely by the Housing Authority; (9) Fassberg is entitled to a setoff in the amount of the retention proceeds; and (10) the judgment cannot be affirmed in part based on misrepresentation as an alternative theory of recovery *389 because the evidence does not support the award of damages for misrepresentation.
The Housing Authority disputes those contentions and contends (1) it is entitled to recover punitive damages in addition to the amounts awarded in the judgment; and (2) the denial of its motion for expert witness fees based on its statutory offer to compromise was error.

DISCUSSION

1. California False Claims Act

The California False Claims Act provides that any person who commits certain acts against the state or a political subdivision is liable to the state or political subdivision for treble damages.[6] (Gov. Code, ง 12651, subd. (a).) Among the prohibited acts are knowingly presenting or causing to be presented "a false claim for payment or approval" by the state or a political subdivision, and knowingly making or using or causing to be made or used "a false record or statement to get a false claim paid or approved." (Id., ง 12651, subd. (a)(1), (2).)[7] The California False Claims Act also provides that any person who commits such an act may be liable for a civil penalty of up to $10,000 for each "false claim." (Id., 12651, subd. (a).) Thus, the act provides for both treble damages for certain acts and a civil penalty for each "false claim." Government Code section 12655, subdivision (c) states that the act "shall be liberally construed and applied to promote the public interest." The California False Claims Act is patterned after the federal False Claims Act (31 U.S.C. ง 3729 et seq.) as amended in 1986, so authorities applying the federal act may be persuasive to the extent the language of the two acts is similar. (State of California v. Altus Finance (2005) 36 Cal.4th 1284, 1299, 32 Cal.Rptr.3d 498, 116 P.3d 1175; Rothschild v. Tyco Internat. (US), Inc. (2000) 83 Cal.App.4th 488, 494, 99 Cal.Rptr.2d 721.)
A "claim" is defined to "include[] any request or demand for money, property, or services made to any employee, officer, or agent of the state or of any political subdivision."[8] (Gov.Code, ง 12650, subd. (b)(1).) "`Knowing' and `knowingly' mean that a person, with respect to information, does any of the following: [ถ] (A) Has actual knowledge of the information. [ถ] (B) Acts in deliberate ignorance of the *390 truth or falsity of the information. [ถ] .(C) Acts in reckless disregard of the truth or falsity of the information. [ถ] Proof of specific intent to defraud is not required." (Id., ง 12650, subd. (b)(2).) A "political subdivision" includes any city, for purposes of the California False Claims Act. (Id., ง 12650, subd. (b)(3).)
The term "includes" in a statutory definition does not necessarily exclude things not specified. (People v. Western Airlines, Inc. (1954) 42 Cal.2d 621, 639, 268 P.2d 723.) "Includes" ordinarily is a term of enlargement rather than limitation. (Flanagan v. Flanagan (2002) 27 Cal.4th 766, 774, 117 Cal.Rptr.2d 574, 41 P.3d 575.) Whether the definition of "claim" in Government Code section 12650, subdivision (b)(1) encompasses things not specified in the statute is a question of legislative intent. (Hassan v. Mercy American River Hospital (2003) 31 Cal.4th 709, 717, 3 Cal.Rptr.3d 623, 74 P.3d 726.) In the context of a statutory scheme that distinguishes "a false claim" (Gov.Code, ง 12651, subd. (a)(1)) from "a false record or statement to get a false claim paid or approved" (id., ง 12651, subd. (a)(2)) and provides an additional remedy for the former, as explained post, we conclude that a record or statement that is not a request or demand for money within the meaning of Government Code section 12650, subdivision (b)(1) is not a "claim."

2. The Evidence Fails to Establish a Sufficient Basis for the Civil Penalty

a. The California False Claims Act Authorizes a Civil Penalty for "a False Claim" but Not for "a False Record or Statement"
The California False Claims Act distinguishes a "claim" from a "record" or "statement." The term "claim" is defined in Government Code section 12650, subdivision (b)(1), quoted ante, without reference to the terms "record" or "statement." The terms "record" and "statement" are not defined in the act. Section 12651, subdivision (a) describes eight prohibited acts for which treble damages may be awarded, four of which refer to either "a false claim" or "a false record or statement." The statute imposes treble damages on a person who "(1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval. [ถ] (2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision. [ถ] ... [ถ] (7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision, [or] [ถ] (8) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim." (Ibid., italics added.)
Government Code section 12651, subdivision (a) states that a person who commits any of the "acts" listed in subdivision (a) is liable for treble damages. Those "acts" include knowingly presenting "a false claim" and knowingly presenting "a false record or statement to get a false claim paid or approved," as stated ante. The statute states, however, that a civil penalty may be imposed not for each "act," but for "each false claim."[9] (Ibid.) We construe *391 the statute in accordance with the plain meaning of the statutory language. (Wells v. One2One Learning Foundation (2006) 39 Cal.4th 1164, 1190, 48 Cal.Rptr.3d 108, 141 P.3d 225.) Section 12651, subdivision (a) clearly distinguishes "a false claim" from "a false record or statement" and authorizes a civil penalty only for "each false claim."[10] Section 12655, subdivision (c) states that the California False Claims Act "shall be liberally construed and applied to promote the public interest," but no liberal construction can alter the plain meaning of the statute in this regard.
The Housing Authority argues that Government Code section 12651, subdivision (a) is ambiguous and should be construed to mean that "false claims" includes not only requests or demands for money, property, or services, but also any other act prohibited by the California False Claims Act. This argument ignores the statutory definition of "claim" (id., ง 12650, subd. (b)(1)) and the careful, not haphazard, use of "false claims" in some places and "false records or statements" in others in section 12651, subdivision (a). Those terms are not interchangeable. As we have explained, the Legislature carefully distinguished the remedies available for different acts.
The Housing Authority cites LeVine v. Weis (2001) 90 Cal.App.4th 201, 108 Cal. Rptr.2d 562 for the proposition that a false certification in connection with a request for payment is itself a false claim under the California False Claims Act. The plaintiff in LeVine was a school teacher who was discharged after he threatened to notify authorities that the school was claiming state funds for students' average daily attendance without providing the expected level of classroom staffing. The state Department of Finance determined after an investigation that the school had received state funds based on false reporting, but the state Department of Education concluded that the school was entitled to receive the funds. A jury found that the school and three school officials had violated the California False Claims Act and awarded the plaintiff compensatory damages under Government Code section 12653, subdivision (c) for violation of section 12653, subdivision (b), which prohibits adverse employment action by an employer against an employee because of acts by the employee "in disclosing information to a government or law enforcement agency or in furthering a false claims action." (LeVine, supra, at pp. 204-207, 108 Cal. Rptr.2d 562.) LeVine concluded that the *392 defendants' certification of average daily attendance was a "false claim" within the meaning of the act and that the school terminated the plaintiff because he had threatened to disclose information pertaining to that "false claim," and therefore concluded that the school was liable for damages under section 12653, subdivision (c). (LeVine, supra, at pp. 211-212, 108 Cal.Rptr.2d 562.) LeVine explained that the "certification of the ADA constituted an actual claim for money based on a representation of fact."[11] (Id. at p. 211, 108 Cal.Rptr.2d 562, 108 Cal.Rptr.2d 562.)
LeVine v. Weis, supra, 90 Cal.App.4th 201, 108 Cal.Rptr.2d 562 did not address the question whether the school could be held liable for damages or a civil penalty under section 12651, subdivision (a) based on a "false claim" and therefore is not on point. Moreover, in our view, for purposes of liability under section 12651, subdivision (a), the quoted statement from LeVine fails to recognize the distinction expressed in the statute between a false claim and a false record or statement in support of a false claim. We therefore decline to follow LeVine.

b. The Weekly Payroll Reports Were Not "Claims" under the Act and Alone Cannot Support a Civil Penalty
Fassberg submitted weekly payroll reports to the Housing Authority as required by the contract. Fassberg also submitted requests for progress payment under the contract approximately every two weeks. Both the payroll reports and the requests for progress payment were accompanied by certifications as to their accuracy and compliance with the contract. The payroll reports and requests for progress payment were separate documents with different functions. The payroll reports, on a standard United States Department of Labor form, provided specific information as to employees' hours worked, work classification, wages and fringe benefits paid, and deductions. The payroll reports did not include a request for payment. The requests for progress payment, in contrast, stated an estimate of the percentage of work completed and the value of that work based on a preapproved schedule of values, and expressly requested payment for the value of work completed, less a 10-percent retention. Fassberg submitted 49 requests for progress payment on the project.
We conclude that each request for progress payment was a "claim" under the California False Claims Act because each request was a "request or demand for money" (Gov.Code, ง 12650, subd. (b)(1)) made to the Housing Authority. The weekly payroll reports, in contrast, were not "claims" because they were not "request[s] or demand[s] for money" (ibid.). Rather, the payroll reports were records required to be submitted under the contract and were records or statements made or used in support of Fassberg's requests for progress payment (see id., ง 12651, subd. (a)(2)). The payroll reports were neither "claims" nor "false claims" as a matter of law and alone cannot support a civil penalty under the act. A false payroll report can support a civil penalty only in conjunction with a "false claim," and in those circumstances the civil penalty is for *393 "each false claim" (id., ง 12651, subd. (a)) rather than for each "false record or statement to get a false claim paid or approved" (id., subd. (a)(2)).[12]
The Housing Authority maintained that Fassberg presented a total of 3,959 false claims, including 2,964 false claims arising from statements in weekly payroll records. The jury found that Fassberg submitted 2,983 false claims. That number necessarily included purported false claims arising from statements in payroll records, although we cannot discern how many. The Housing Authority is not entitled to a civil penalty either for each false payroll record or for each misstatement in the payroll records, as a matter of law. We conclude that the judgment must be reversed as to the civil penalty for false claims for a new trial on the cross-complaint to determine the number of false claims, if any, and the appropriate civil penalty, consistent with the views expressed in this opinion.[13]

c. The Change Order Proposals Were Not "Claims" under the Act and Alone Cannot Support a Civil Penalty
Section 29(d) of the contract stated that if any order or direction by the Housing Authority caused a change in the work resulting in an increase or decrease in Fassberg's cost or time to complete the work, the Housing Authority "shall make an equitable adjustment and modify the contract in writing." Section 29(e) stated that Fassberg must request an equitable adjustment in writing, ordinarily within 30 days after receipt of a written notice of the change in the work, "by submitting a written statement describing the general nature and the amount of the proposal." Section 29(f) stated that a "written proposal for equitable adjustment shall be submitted in the form of a lump sum proposal supported with an itemized breakdown of all increases and decreases in the contract," with specified details. The contract stated further that the Housing Authority "shall act on proposals within 30 days after their receipt, or notify the Contractor of the date when such action will be taken," and that "[f]ailure to reach an agreement on any proposal shall be a dispute under the clause entitled Disputes herein."
Fassberg submitted change order proposals on a form provided by the Housing Authority. The form was entitled Change Order Proposal and stated, "Following is an itemized quotation regarding proposed modifications to the contract documents." It called for a description of the work, an itemization of the subcontractor's cost, general contractor's cost, 10-percent overhead and profit, and 1-percent bond cost, and a statement as to how many days the "proposed change" would delay the project completion. Both parties understood that a change order proposal must be approved by the Housing Authority and that the Housing Authority must issue a written change order before Fassberg could renumber *394 quest payment for work encompassed in a change order proposal.
The Housing Authority argues that Fassberg submitted change order proposals requesting price increases for work that was already included in the contract price, work necessitated by delays caused by Fassberg and its subcontractors, and work for which Fassberg otherwise was not entitled to additional compensation. The Housing Authority also argues that the requested price increases were excessive. Hostettler testified on behalf of the Housing Authority that the change order proposals stated excessive wage rates and greater costs for "general conditions," insurance, and bonds for which Fassberg failed to submit sufficient supporting documentation. Hostettler expressly declined to characterize the change order proposals as "wrong or false." Rather, he testified that the change order proposals contained "questionable charges" and "undocumented and unevidenced claims for money." He testified that the change order proposals contained "948 incidences of claims" or "questionable change order incidences in which a change Order was presented to the Housing Authority for payment and in which it included undocumented and unevidenced claims for money."
On the other hand, James Evans, a field superintendent for the Housing Authority who was partly responsible for reviewing change order proposals, testified that a change order proposal was not a request for payment: "It would not be a request for payment as far as I was concerned because they submitted on a monthly basis a billing for payment. It wasโit was something that we owed them at some point in time, but there would not be a request for payment. They had a separate request for payment that they submitted monthly, and they could not include approved change order proposals on thatโ for payment for that until such time as they received the change order."
The question whether the change order proposals were "claims" for purposes of the California False Claims Act is a question of law involving the application of a statute to undisputed facts. (Daun v. USAA Cas. Ins. Co. (2005) 125 Cal.App.4th 599, 605, 23 Cal.Rptr.3d 44.) Absent an underlying factual dispute, whether the change order proposals were "claims" under the statute is a question of law for the court to decide without regard to the opinions of expert or percipient witnesses or the finding by the jury that Fassberg knowingly submitted 2,983 false claims. Our review is de novo. (Ibid.)
A change order proposal differs from a request for progress payment in that the former is a request to modify the contract to allow for future payment, while the latter is a request for immediate payment. A change order proposal, if approved, would be followed by a written change order and then a request for progress payment. Federal courts have held that if a contractor obtained a contract through collusive or fraudulent bidding, each request for payment under the contract is a false claim under the federal False Claims Act, regardless of the objective truth of the request for payment standing alone. (U.S. ex rel. Marcus v. Hess (1943) 317 U.S. 537, 543-544, 63 S.Ct. 379, 87 L.Ed. 443; Harrison v. Westinghouse Savannah River Co. (4th Cir.1999) 176 F.3d 776, 787-788.) This is so because each request for payment, although perhaps not false in itself after the public agency has agreed to the contract price, relies on the prior falsity. (Marcus, supra, at p. 543, 63 S.Ct. *395 379;[14]Harrison, supra, at pp. 787-788.)
We find these authorities persuasive and conclude that the same rule should apply to a false change order proposal: If a contractor knowingly presents a false change order proposal and a change order is issued in reliance thereon, each request for progress payment of amounts payable under the change order is a false claim under the California False Claims Act. We distinguish a request for progress payment based on a false change order proposal from the prior change order proposal itself, however. In our view, a change order proposal is not a "request or demand for money, property, or services" (Gov.Code, ง 12650, subd. (b)(1)) within the plain meaning of the statutory language, but rather is a "record or statement" made or used "to get a false claim paid or approved" (id., ง 12651, subd. (a)(2)). We therefore conclude that the change order proposals were neither "claims" nor "false claims" under the act as a matter of law and alone cannot support a civil penalty under the act. A false change order proposal can support a civil penalty only in conjunction with a "false claim," and in those circumstances the civil penalty is for "each false claim" (id., ง 12651, subd. (a)) rather than for each "false record or statement to get a false claim paid or approved" (id., subd. (a)(2)). The Housing Authority is not entitled to a civil penalty either for each false change order proposal or for each false statement in a change order proposal, as a matter of law.
The Housing Authority cites Stacy & Witbeck, Inc. v. City and County of San Francisco (1996) 47 Cal.App.4th 1, 54 Cal. Rptr.2d 530 for the proposition that a change order proposal is a "claim" for purposes of the California False Claims Act. Stacy held that "a contract claim for overages purportedly incurred on a public works project" was not a privileged publication under Civil Code section 47, subdivision (b) and therefore could be the subject of a cause of action for false claims under the California False Claims Act. (Stacy, supra, at pp. 3, 5, 54 Cal.Rptr.2d 530.) Stacy is factually distinguishable in that the city in that case expressly directed the contractor to request payment for extra work by presenting a "claim." (Stacy, supra, at pp. 4-5, 54 Cal.Rptr.2d 530.) "Stacy was `directed' to submit its change order requests as a claim under the contract." (Id. at p. 6, 54 Cal.Rptr.2d 530.) Moreover, Stacy did not decide whether the "contract claim" was a "claim" for purposes of the California False Claims Act, but only that the claim was not protected by the litigation privilege.

d. We Need Not Decide Fassberg's Other Contentions Concerning the Sufficiency of the Evidence to Support the Civil Penalty
Our conclusion that the Housing Authority is not entitled to a civil penalty for each payroll record or change order proposal, or each false statement in those documents, compels the conclusion that the evidence does not support the finding of 2,983 false claims and that the judgment must be reversed and the case remanded for a new trial to determine the number of false claims, if any, and the appropriate civil penalty. Accordingly, we need not address Fassberg's other contentions *396 concerning the sufficiency of the evidence in the present record to support the civil penalty.[15]

3. The Evidence Fails to Establish a Sufficient Basis for the Award of Damages Resulting from False Claims

a. Trial Court Proceedings
Hostettler testified that the certified payroll records revealed 2,964 instances of underpayment of wages totaling "approximately $455,000." He stated that if a subcontractor failed to pay prevailing wages, the contractor (Fassberg) was liable to the Department of Labor and the Housing Authority for the shortfall. He prepared a 29-page exhibit entitled Certified Payroll Analysis (exhibit 9047) that lists individual workers, the amounts actually paid to each worker, the amounts that should have been paid, and the shortfall for each worker per week, but does not state the aggregate shortfall for all workers. That is, the figure of approximately $455,000 does not appear in exhibit 9047.
The Housing Authority argued to the court that it was entitled to recover unpaid prevailing wages on the project as an element of damages for breach of contract, although there was no evidence that the Housing Authority had paid or had been sued for the shortfall. The court disagreed and instructed the jury: "There is no damage claim being made in this case by the Housing Authority for any alleged underpayment of wages to employees on the project. However, you may consider evidence of any alleged underpayment of wages insofar as it may be relevant of the issue of whether or not the retention should be withheld."
Counsel for the Housing Authority stated in closing argument that the total amount of damages suffered by the Housing Authority on all counts was $1,159,014.60. She listed the individual items of damages as liquidated damages for 256 days of delay at the rate of $1,500 per day ($384,000), damages for the Housing Authority's deductive change order proposals that should have reduced the contract price paid ($677,932.77), damages for an additional credit due for the deletion of work relating to handicap parking spaces ($43,099.82), and damages for overcharges for labor in change orders paid by the Housing Authority ($45,882).[16] Counsel stated, "Some of these damages go to one [count]. Some of them will go to more than one, and it will be up to you to decide." Counsel did not request damages for false claims either in summing up the total damages suffered or in describing and counting the purported false claims.
*397 Counsel for the Housing Authority stated in closing argument, while discussing the Housing Authority's justification for failing to release the retained funds, that Fassberg failed to pay $455,085.37 in prevailing wages due to workers. Counsel also stated during closing argument, outside of the context of retained funds, that Fassberg failed to pay "about a half a million dollars" in prevailing wages and referred to "over a half a million dollars in back wages that are owed to people."
The jury requested a list of exhibits during its deliberations. The court provided separate lists of exhibits offered by each party. The jury later inquired: "Can you provide us with documents listing HACLA's damages with regards to the following: (1) labor, (2) NARBI, (3) labor and trust, (4) deductive C.O.P.'s, (5) handicap parking, (6) prevailing wages." In response, the court reminded the jury: "There is no damage claim being made in this case by the Housing Authority for any alleged underpayment of wages to employees on the project. However, you may consider evidence of any alleged underpayment of wages insofar as it may be relevant to the issue of whether or not the retention should be withheld." The court stated further, "The reason that's important is as I go through and list these documents, some of them can only be considered for the issue of whether or not the retention should be withheld, not for damages, even though they are within the list of documents you asked us to identify. So I'm going to identify them, but I just want you to understandโand I'll distinguish between them for youโsome of them can only be considered on the issue of retention and whether it should have been withheld or not. It cannot be included in any calculation of damages that you might be making."
The court identified exhibits and stated that as to the first three enumerated items in the jury's request, the exhibits could be considered "only on the issue of whether or not the retention should have been withheld, not on the issue of damages." The court stated that the exhibits as to items 4 and 5 could be considered with respect to both the retention and damages. The court stated with respect to item 6: "And then with respect to the category that you list of prevailing wages, there are two exhibits. The first is exhibit 9044. 9044. That is a chart of the C.O.P.'s. That exhibit may be considered on the issue of damages. 9044, may be considered on the issue of damages. The second exhibit that's relevant to your inquiry as phrased is exhibit 9047, which is a chart of ... the certified payroll. That is an exhibit that can only be considered on the issue of whether the retention should have been withheld. It cannot be considered in terms of calculating whatever damages that you believe have been proved." [17]
The court stated further: "We believe that's responsive to your inquiry. Does anybody need me to read them again? Raise your hand if you need me to read them again." The jury foreperson stated, "The last one." The court responded: "Last one. Prevailing wages, 9044, which can be considered on the issue of damages. *398 And then 9047 which can only be considered on the issue of retention. It cannot be considered on the issue of damages."
The jury found that Fassberg knowingly submitted 2,983 false claims resulting in $455,000 in damages. The jury also found that the Housing Authority suffered $1,104,000 in damages resulting from Fassberg's breach of contract and that the Housing Authority suffered $1,559,000 (the sum of $1,104,000 and $455,000) in damages resulting from misrepresentations. The court trebled the award of damages for false claims pursuant to Government Code section 12651, subdivision (a) and awarded the Housing Authority $1,365,000 in treble damages for false claims, $1,104,000 in damages for breach of contract, and a civil penalty of $1,491,500 ($500 per claim). Fassberg challenged the finding of $455,000 in damages for false claims by moving for a partial judgment notwithstanding the verdict, arguing that the finding was not supported by the evidence and was contrary to the jury instruction. Fassberg also moved for a new trail on the same ground. The court denied both motions.

b. Standards of Review
We review the jury's finding that the Housing Authority suffered $455,000 in damages resulting from false claims under the substantial evidence standard. Substantial evidence is evidence that a rational trier of fact could find to be reasonable, credible, and of solid value. We view the evidence in the light most favorable to the verdict and accept as true all evidence tending to support the verdict, including all facts that reasonably can be deduced from the evidence. We must affirm the award of damages based on the verdict if an examination of the entire record viewed in this light discloses substantial evidence to support the verdict. (Crawford v. Southern Pacific Co. (1935) 3 Cal.2d 427, 429, 45 P.2d 183; Kuhn v. Department of General Services (1994) 22 Cal.App.4th 1627,1633, 29 Cal.Rptr.2d 191.)
A party is entitled to a judgment notwithstanding the verdict only if there is no substantial evidence to support the verdict and the evidence compels a judgment for the moving party as a matter of law. (Code Civ. Proc., ง 629; Clemmer v. Hartford Insurance Co. (1978) 22 Cal.3d 865, 877-878, 151 Cal.Rptr. 285, 587 P.2d 1098.) A party is entitled to a partial judgment notwithstanding the verdict if there is no substantial evidence to support the verdict on a particular issue and the evidence compels a judgment for the moving party on that issue as a matter of law. (Beavers v. Allstate Ins. Co. (1990) 225 Cal.App.3d 310, 323-324, 274 Cal.Rptr. 766.) The trial court must view the evidence in the light most favorable to the verdict, disregard conflicting evidence, and indulge in every legitimate inference to support the verdict. (Clemmer, supra, at pp. 877-878, 151 Cal. Rptr. 285, 587 P.2d 1098) On appeal, we independently determine whether there is substantial evidence to support the verdict and whether the moving party is entitled to judgment in its favor as a matter of law. (Shapiro v. Prudential Property & Casualty Co. (1997) 52 Cal.App.4th 722, 730, 60 Cal.Rptr.2d 698.) If an appellate court determines that the trial court denied a motion for judgment notwithstanding the verdict that should have been granted, the appellate court must order the entry of judgment in favor of the moving party. (Code Civ. Proc., ง 629.)

c. The Jury Improperly Awarded the Housing Authority the Amount of Underpaid Prevailing Wages as Damages for False Claims
The evidence presented at trial, argument of counsel, and questions by the *399 jury leave no room for reasonable doubt as to the basis for the jury's finding that the Housing Authority suffered $455,000 in damages resulting from false claims. Hostettler testified that workers on the project were underpaid by "approximately $455,000" in prevailing wages and that the contractor (Fassberg) was liable to the Housing Authority for that shortfall. Counsel for the Housing Authority stated in closing argument that Fassberg failed to pay $455,085.37 in prevailing wages due to workers. Although counsel made that statement in the context of justifying the Housing Authority's failure to release the retention proceeds, counsel also stated during closing argument without reference to the retention issue that Fassberg failed to pay "about half a million dollars" in prevailing wages and referred to "over half a million dollars in back wages that are owed to people."
Despite the court's instruction that the Housing Authority was not seeking to recover damages, for underpayment of wages, the jury requested "documents listing HACLA's damages with regards to ... prevailing wages." The jury apparently sought documentary evidence of the Housing Authority's damages with regard to the underpayment of wages for the purpose of awarding those damages. The court reinstructed the jury that the Housing Authority did not seek to recover damages for underpayment of wages and identified two exhibits pertaining to prevailing wages.
The two exhibits were exhibits 9044 (Final Labor Submission Analysis) and 9047 (Certified Payroll Analysis). The court stated that the former could be considered on the issue of damages while the latter could be considered only on the issue of the retention.[18] The court apparently determined that the amounts paid by the Housing Authority pursuant to approved change order proposals for wages claimed in excess of the amounts actually paid to workers, as purportedly shown in exhibit 9044, were recoverable as damages. Exhibit 9044 stated that information for each change order proposal, but did not state the total amount of $45,882 that was cited by Hostettler in his testimony and by counsel for the Housing Authority in closing argument. The exhibit was lengthy, complex, somewhat confusing, did not expressly state that the amounts shown were approved and paid rather than only requested in unapproved or unpaid change orders, and did not readily yield the information that the jury was seeking to determine as to the amount of recoverable damages. The jury apparently did not associate exhibit 9044 with the $45,882 figure and therefore did not understand the instruction to mean that that amount could be awarded as damages and the amount purportedly shown in exhibit 9047 could not be awarded as damages.
The court instructed the jury to consider exhibit 9047 only with respect to the retention issue and not for the purpose of damages. Exhibit 9047 purportedly stated the amount underpaid for each worker on the project for each week, but did not state the total amount of approximately $455,000 that was cited by Hostettler in his testimony and by counsel for the Housing Authority in closing argument. That figure could be calculated only by adding numbers from each of the hundreds of entries on the 29-page exhibit. The jury apparently, and understandably, did not associate exhibit *400 9047 with the $455,000 figure and therefore did not understand the instruction to mean that it could not award that amount as damages.[19]
The jury found that the Housing Authority suffered $1,104,000 in damages resulting from Fassberg's breach of contract. That figure is the sum of each amount of damages listed in the Housing Authority's closing argument except $45,882, rounded down to the nearest multiple of $1,000 (i.e., $384,000 + $677,000 + $43,000 = $1,104,000). The jury also found that the Housing Authority suffered an additional $455,000 in damages resulting from false claims. Thus, we can conclude with reasonable certainty that rather than exclude the $455,000 figure from its calculation of damages, the jury excluded the $45,882 figure from its calculation of damages.
The fact that the jury awarded $455,000 in damages resulting from false claims, the precise amount stated by the Housing Authority's expert witness at trial as the amount of underpaid wages, is a strong indication that the jury accepted Hostettler's testimony on that point and awarded damages for underpaid wages. (Seffert v. Los Angeles Transit Lines (1961) 56 Cal.2d 498, 505, 15 Cal.Rptr. 161, 364 P.2d 337.) The repeated emphasis in the Housing Authority's closing argument on the amount of underpaid wages and the jury's request for documents pertaining to "damages with respect to ... prevailing wages" also suggest that the jury believed that the Housing Authority was entitled to damages for underpayment of prevailing wages. Despite the court's response to the jury's request and the identification of exhibits pertaining to prevailing wages, the jury apparently failed to understand that the Housing Authority was not entitled to recover $455,000 in damages for the underpayment of wages. We conclude that the award of $455,000 in damages for false claims was based on the underpayment of prevailing wages for which the Housing Authority was not entitled to recover damages.
The Housing Authority argues on appeal that it is entitled to recover the amounts paid to Fassberg under the contract in reliance on the purported false certifications of weekly payroll reports. It argues that the measure of damages for false claims is the difference between the total amount paid to Fassberg and the amount it would have paid if the payroll certifications had been truthful. The Housing Authority refers to Hostettler's testimony that approximately $455,000 of wages due to workers on the project was not paid to the workers, but does not expressly argue that it was damaged in that amount or that it is entitled to recover damages measured by the amount of underpaid wages. The Housing Authority's argument on this point is perfunctory and poorly explained.[20] The Housing Authority apparently argues *401 that the payment of prevailing wages to workers was a necessary condition for payment to Fassberg under the contract, that because some workers were not paid prevailing wages the Housing Authority had no obligation to make progress payments to Fassberg under the contract, and that the total amount paid in excess of the amount the Housing Authority was required to pay is recoverable as damages under the California False Claims Act.[21] We reject that argument.
The ordinary measure of damages under California law for breach of an obligation not arising from a contract is the amount that will compensate for all of the loss or harm proximately caused by the breach. (Civ.Code, งง 3333, 3282.)[22] The Housing Authority received what it paid for and accepted under the terms of the contract: a completed work of construction. The Housing Authority has not shown that it paid the workers any part of the wages shortfall or has been sued for such a recovery. It has not shown that the failure to pay prevailing wages to some of the workers on the project increased the cost of construction paid by the Housing Authority, impaired the value of the completed project, or caused any cognizable loss or harm to the Housing Authority. The Housing Authority is not entitled to disgorgement of amounts paid under the contract as damages (trebled under Government Code section 12651, subdivision (a)) because those amounts do not reflect an actual loss or harm to the Housing Authority. (See Harrison v. Westinghouse Savannah River Co. (4th Cir.2003) 352 F.3d 908, 923 [rejected a similar argument under the federal False Claims Act]; Ab-Tech Construction, Inc. v. United States (Fed.Cl.1994) 31 Fed.Cl. 429, 434, affd. (Fed.Cir.1995) 57 F.3d 1084 [same].)
U.S. v. Mackby (9th Cir.2003) 339 F.3d 1013, cited by the Housing Authority, is not on point. The Ninth Circuit in Mackby held that a judgment awarding civil penalties and treble damages under the federal False Claims Act against the owner of a physical therapy clinic was not excessive under the Eighth Amendment excessive fines clause because the amount of the judgment was not grossly disproportional to the harm caused. (Id. at p. 1017.) The trebled damages consisted of Medicare reimbursements that the defendant was ineligible to receive under federal regulations because he was neither a physician nor a physical therapist. (Id. at pp. 1014-1015.) Discussing the harm caused by the false claims, Mackby stated that the government was harmed in the amount of the Medicare payments, despite the defendant's provision of services to patients, because the defendant was ineligible to receive Medicare payments. (Id. at pp. 1018-1019.) Here, in contrast, no statute or regulation makes Fassberg ineligible to receive payment for the work performed.
We conclude that the award of $455,000 in damages for false claims, trebled by the trial court to $1,365,000, was based on underpaid wages and that the Housing Authority is not entitled to recover that amount as damages under the California *402 False Claims Act. We conclude further, however, that Fassberg has not shown that the evidence compels the conclusion that the Housing Authority suffered no damages as a result of false claims or false records or statements, and therefore affirm the denial of Fassberg's motion for a partial judgment notwithstanding the verdict. Fassberg alludes to the denial of its motion and argues' that the damages award cannot be affirmed based on the underpayment of wages, but offers no meaningful argument why the evidence compels the conclusion that the Housing Authority suffered no damages at all resulting from false claims or false records or statements. The question of such damages, if any, can be decided in a new trial in connection with the question whether Fassberg made false claims and, if so, how many.

4. Fassberg Is Entitled to $402,717.95 Credit for Work Performed Pursuant to Change Order Proposals

The Housing Authority verbally authorized Fassberg to proceed with the additional work in some change order proposals but did not agree to the requested price. Fassberg completed the work. The Housing Authority accepted the work but refused to issue written change orders or pay the amounts requested, or any amount, for the additional work because it determined that it was entitled to a credit in the amount of $677,932.77 for work deleted from the contract, which exceeded the amount due to Fassberg for the additional work. The Housing Authority determined that Fassberg was entitled to payment in the amount of $402,717.95 for the additional work described in the change order proposals. Mark Strauss, who worked for Dugan as a project manager, testified on direct examination by counsel for the Housing Authority that $402,717.95 was the amount due to Fassberg for "unpaid C.O.P.'s": "Yes it is. That's the amount owed to Fassberg." The Housing Authority's exhibit 9232 listed "Non Change Ordered COPs" and showed that Fassberg claimed that it was entitled to a total of $1,630,783.82 for work described in change order proposals and that the Housing Authority had determined that only $402,717.95 was due to Fassberg.
Counsel for the Housing Authority acknowledged in closing argument that Fassberg was entitled to approximately $400,000 for "not-paid change order proposals." She stated, "The analysis done by Dugan and the Housing Authority actually shows that [Fassberg is] owed closer to $400,000 for not-paid change order proposals." Referring to the Housing Authority's deductive change order proposals totaling $677,932.77, counsel argued that the net amount due to the Housing Authority for change order proposals was "about $275,000." But in summarizing the Housing Authority's claims for damages, counsel requested an amount that included the full $677,932.77 figure for deductive change order proposals. (See section 3.a., ante.) The jury apparently awarded the Housing Authority each of the amounts requested in its closing argument, rounded down to the nearest multiple of $1,000, except $45,882 purportedly "overpaid on C.O.P. labor." (See section 3.c, ante.) Thus, the jury did not credit Fassberg for $402,717.95 that the Housing Authority admitted was due and owing to Fassberg. Moreover, the jury found that the Housing Authority did not breach the contract or the implied covenant of good faith and fair dealing and awarded no damages to Fassberg.
Fassberg moved for a new trial arguing, inter alia, that the evidence was insufficient to support the finding that the Housing Authority did not breach the contract *403 with respect to the change order proposals, and that the award of $1,104,000 in damages to the Housing Authority for Fassberg's breach of contract was excessive because that amount was not reduced by $402,717.95 that the Housing Authority conceded it owed to Fassberg. The court denied the motion.
Code of Civil Procedure section 657 states: "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." A trial court has broad discretion in ruling on a new trial motion, and the court's exercise of discretion is accorded great deference on appeal. (City of Los Angeles v. Decker (1977) 18 Cal.3d 860, 871-872, 135 Cal. Rptr. 647, 558 P.2d 545.) An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. (Shamblin v. Brattain (1988) 44 Cal.3d 474, 478-479, 243 Cal.Rptr. 902, 749 P.2d 339; Denham v. Superior Court (1970) 2 Cal.3d 557, 566, 86 Cal.Rptr. 65, 468 P.2d 193.) Accordingly, we can reverse the denial of a new trial motion based on insufficiency of the evidence or excessive damages only if there is no substantial conflict in the evidence and the evidence compels the conclusion that the motion should have been granted.
We conclude that Fassberg is entitled to $402,717.95 in credit for work performed pursuant to change order proposals for which the Housing Authority issued no written change order. There is no substantial conflict in the evidence in this regard. Strauss testified that Fassberg was entitled to payment in that amount, and the Housing Authority acknowledged the same both in exhibit 9232 and in closing argument. Moreover, an oral statement by counsel in the same action is a binding judicial admission if the statement was an unambiguous concession of a matter then at issue and was not made improvidently or unguardedly. (People v. Jackson (2005) 129 Cal.App.4th 129, 161, 28 Cal.Rptr.3d 136; Invin v. Pacific Southwest Airlines (1982) 133 Cal.App.3d 709, 714, 184 Cal.Rptr. 228; Scafidi v. Western Loan & Bldg. Co. (1946) 72 Cal. App.2d 550, 562, 165 P.2d 260.) The statement by counsel for the Housing Authority in closing argument was clear and deliberate. Counsel endorsed the response she elicited from Strauss on direct examination that Fassberg was entitled to payment of, in counsel's words, "closer to $400,000." Strauss's testimony and the Housing Authority's exhibit 9232 specified the amount as $402,717.95. The Housing Authority is bound by its judicial admission.
We can conclude with reasonable certainty that the award of $1,104,000 in damages for breach of contract includes $677,000 for the Housing Authority's deductive change order proposals and does not include a $402,717.95 credit for work performed pursuant to Fassberg's change order proposals, as we have stated. We conclude that the evidence and the Housing Authority's judicial admission compel the conclusion that Fassberg is entitled to a $402,717.95 credit. Accordingly, we need not decide whether the Housing Authority's failure to pay that amount was a breach of contract. Moreover, a new trial on damages for breach of contract is unnecessary because we can finally determine the parties' rights on this issue based on the unchallenged amounts awarded by the jury together with our conclusion that *404 Fassberg is entitled to the credit. We therefore will reverse the award with directions to the trial court to reduce the award of damages to the Housing Authority for breach of contract from $1,104,000 to $701,282.05 ($1,104,000โ$402,717.95 = $701,282.05). A reversal with directions to reduce the award, rather than a modification of the judgment on appeal, is appropriate in order to allow the Housing Authority an opportunity to move for a new trial on the ground of inadequate damages (Code Civ. Proc., ง 657, subd. (5)), should it choose to do so. (Woodcock v. Fontana Scaffolding & Equip. Co. (1968) 69 Cal.2d 452, 459-60, 72 Cal.Rptr. 217, 445 P.2d 881.)[23]

5. Fassberg Has Shown No Error with Respect to Damages for Delay Caused by the Housing Authority

The contract provided for liquidated damages payable to the Housing Authority in the amount of $1,500 per day if Fassberg failed to timely complete the work. The contract also provided that if the Housing Authority caused a delay in the work for an unreasonable period of time resulting in an increase in the cost of performance, the Housing Authority would adjust the contract price.[24] Mark Evans, an expert witness for the Housing Authority, testified that the project was delayed a total of 526 days, including 256 days of delay attributed solely to Fassberg, 116 days attributed solely to the Housing Authority, 107 days attributed to both parties, and 47 days attributed to force majeure and holidays. The Housing Authority's exhibit 9177 stated these conclusions. Evans offered no opinion as to whether the 116 days of delay attributed solely to the Housing Authority increased the cost of the work.
James Howard, an expert witness for Fassberg, testified that the Housing Authority caused 779 days of compensable delay for which Fassberg was not compensated. Karl Schulze, another expert witness for Fassberg, testified that Fassberg's extended home office overhead costs and extended field office overhead *405 costs attributable to compensable periods of delay were approximately $343,000 and $883,000, respectively, totaling $1,227,000.[25] Schulze also testified that Fassberg suffered a total of $3,468,000 in lost profits resulting from the delays. Fassberg sought a total of $8,780,374 in damages for breach of contract, including damages purportedly caused by the delays.
Counsel for the Housing Authority acknowledged in closing argument that the Housing Authority was solely responsible for 116 days of delay, rather than the higher figure claimed by Fassberg. She challenged Fassberg's damages calculations as inflated and based on inaccurate estimates of the number of days of delay. She urged the jury to find that Fassberg had failed to prove its damages. She argued in the alternative that the jury should find that the Housing Authority was responsible for 116 days of delay and either reduce Fassberg's requested damages proportionally or award $1,500 per day or less for the delay.
The jury found that the Housing Authority did not breach the contract or the implied covenant of good faith and fair dealing. Fassberg moved for a new trial arguing, inter alia, that the evidence was insufficient to support the finding that the Housing Authority did not breach the contract by failing to compensate Fassberg for the delay, and that the award of damages to the Housing Authority was excessive because it did not include a credit for the delay caused by the Housing Authority. The court denied the motion.
Fassberg argues on appeal that it is undisputed that the Housing Authority was solely responsible for 116 days of delay. Fassberg argues that the Housing Authority "was required to compensate [Fassberg] for its increased costs." On the issue of increased costs, Fassberg cites only Evans's testimony that Fassberg "probably should have been paid maybe a thousand dollars a day, if that, for overheads" and that the Housing Authority, "as far as I know, felt that they owed Fassberg some compensation" for delay. Fassberg argues that the finding that the Housing Authority did not breach the contract is contrary to the evidence and that the judgment should be reversed for a new trial and a determination of the amount of damages payable to Fassberg,
Section 30(b) of the contract stated that the Housing Authority was required to make an adjustment in the contract price "for any increase in the cost of performance necessarily caused" by an unreasonable delay. The Housing Authority breached its obligation under section 30(b) only if a delay caused by the Housing Authority was "for an unreasonable period of time" and "necessarily caused" an "increase in the cost of performance." Moreover, damages suffered as a result of the breach is an essential element of a cause of action for breach of contract (St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co. (2002) 101 Cal. App.4th 1038, 1060, 124 Cal.Rptr.2d 818), as the court here instructed the jury. The admitted fact that the Housing Authority caused 116 days of delay does not necessarily compel the conclusion that those delays increased the cost of performance. The effect of the delays on the cost of performance could depend on many factors. Fassberg fails to meaningfully discuss the evidence on this point and does not explain when the delays occurred or how they resulted in increased costs.
*406 Fassberg cites none of the testimony by its own expert witnesses on the delays and resulting cost increases. We presume that the jury rejected that testimony. (Denham v. Superior Court, supra, 2 Cal.3d at p. 564, 86 Cal.Rptr. 65, 468 P.2d 193 [presumption in favor of the judgment].) Fassberg does not explain why it was error to do so. The cited testimony by the Housing Authority's expert that Fassberg "probably should have been paid may be a thousand dollars a day, if that, for overheads" (italics added) and that the Housing Authority, "as far as I know, felt that they owed Fassberg some compensation" for delay is not an unequivocal party admission and is by no means conclusive on the question of Fassberg's increased costs. Although it seems likely that 116 days of delay ordinarily would result in increased costs on a construction project of this sort, we cannot presume that that was true here. Rather, we must presume that the evidence supports the verdict unless Fassberg affirmatively demonstrates prejudicial error. (Id.) Fassberg can overcome the presumption and demonstrate prejudicial error only by citing and discussing the evidence. Fassberg has failed to do so. Moreover, by failing to meaningfully discuss the evidence on point, Fassberg waives its challenge to the sufficiency of the evidence. (Foreman & Clark Corp. v. Fallon (1971) 3 Cal.3d 875, 881, 92 Cal. Rptr. 162, 479 P.2d 362; County of Solano v. Vallejo Redevelopment Agency (1999) 75 Cal.App.4th 1262, 1274, 90 Cal.Rptr.2d 41.)

6. The Evidence Fails to Establish a Sufficient Basis for the Award of Compensatory Damages for Misrepresentation

The judgment awards the Housing Authority damages for breach of contract, treble damages for false claims, and a civil penalty, in lieu of compensatory damages for misrepresentation and punitive damages. In light of our conclusion that the damages awarded for breach of contract are excessive and that the evidence fails to support either the damages for false claims or the civil penalty, the question arises whether the Housing Authority's election of remedies precludes it from recovering the alternative remedies that it did not elect. We conclude that there is no substantial evidence to support the award of compensatory damages for misrepresentation and therefore no basis for punitive damages, as we shall explain. Therefore, we need not decide whether the election of remedies was binding for purposes of this appeal.
The court instructed the jury that the Housing Authority's count for intentional misrepresentation was based on "false representations in certain change order proposals, in certain certifications for payroll and certain certifications for progress payments." Counsel for the Housing Authority stated in closing argument that the count was "based on change order proposals, certified payrolls and progress payments. And this isn't too different from the false claims. They actually misrepresented the percentage of completions. They misrepresented, intentionally, the subcontractor and their certified payroll; and they misrepresented that the change order proposals were actually reasonable, that they were accurate, that they hadโ that they were not double and triple billing."
Counsel for the Housing Authority described the categories of damages sought on its cross-complaint as a whole as liquidated damages for delay caused by Fassberg ($384,000), damages for changes in the scope of work reflected in the Housing Authority's deductive change order proposals ($677,932.77), damages for work deleted with respect to handicap parking in particular ($43,099.82), and damages for *407 labor overcharges in change orders paid by the Housing Authority ($45,882). Counsel stated, "Some of these damages go to one [count]. Some of them will go to more than one, and it will be up to you to decide." Counsel did not explain in closing argument which categories of damages allegedly resulted from the misrepresentations or how the misrepresentations caused damages.
The jury found that Fassberg knowingly made one or more misrepresentations of material fact to the Housing Authority, that Fassberg intended to induce reliance, that the Housing Authority reasonably relied on the false representations, and that the Housing Authority suffered $1,559,000 in damages as a result. That amount is the sum of $1,104,000 and $455,000, the damages that the jury found resulted from Fassberg's breach of contract and false claims, respectively. The jury also found that the Housing Authority's "total recoverable damages . . [e]liminat[ing] any double recovery for the same damages on more than one cause of action" was $1,559,000. The trial court concluded that the damages awarded for misrepresentation included the same damages awarded for breach of contract and false claims and was simply the sum of those two figures. We agree that there is no room for reasonable doubt that this is true. Thus, we conclude that the compensatory damages award for misrepresentation includes liquidated damages for delay caused by Fassberg ($384,000), damages for changes in the scope of work reflected in the Housing Authority's deductive change order proposals ($677,932.77, rounded down to $677,000), damages for work deleted with respect to handicap parking ($43,099.82, rounded down to $43,000), and damages for underpaid wages to workers on the project ($455,000).
A plaintiff seeking to recover damages for economic loss caused by fraud must show that the plaintiff actually relied on the defendant's misrepresentation or nondisclosure, that the reliance was reasonable, and that the plaintiff suffered damages as a result. (City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (1998) 68 Cal.App.4th 445, 482, 80 Cal.Rptr.2d 329; Conrad v. Bank of America (1996) 45 Cal.App.4th 133, 159, 53 Cal. Rptr.2d 336.) The evidence presented at trial reveals no connection between any misrepresentation in a change order proposal, weekly payroll report, or request for progress payment and the delays in construction or damages caused by the delays. The Housing Authority's witnesses testified that Fassberg and its subcontractors understaffed the project and as a result did not complete the project on schedule and that delays also resulted from Fassberg having to correct its own deficient work. But they did not testify that any act by the Housing Authority in reliance on a misrepresentation by Fassberg resulted in a construction delay. We conclude that the jury awarded the contract remedy of liquidated damages for delay, totaling $384,000, as an element of damages for misrepresentation despite the absence of substantial evidence to establish that the Housing Authority suffered those damages as a result of any misrepresentation.
The evidence also fails to establish a basis to recover the amount of the Housing Authority's deductive change order proposals as damages for misrepresentation. The contract stated that the Housing Authority could issue a change order at any time altering the scope of work. If a change order caused an increase or decrease in either the cost of construction or the time to perform the contract, the Housing Authority was required to "make *408 an equitable adjustment and modify the contract in writing." The Housing Authority made such an equitable adjustment in April 2003, when it notified Fassberg in writing of its determination to reduce the contract price by $677,932.77 due mainly to Fassberg's substitution of inferior materials for materials required by the contract. Despite the substitution of inferior materials, Fassberg in its requests for progress payment certified that the work was completed in compliance with the contract. The Housing Authority generally made the progress payments in the amounts requested. The Housing Authority presented no evidence at trial, however, that it was ignorant of the substituted materials at the time it made the payments,[26] and therefore failed to establish actual reliance on the certifications submitted with the requests for progress payments. No other potential basis to recover the amount of the deductive change orders as damages for misrepresentation appears in the record. The Housing Authority in its closing argument did not expressly seek to recover the amount of the deductive change orders as damages for misrepresentation or explain how the misrepresentations caused those damages. We conclude that there is no substantial evidence to support the award of those damages for misrepresentation.
The Housing Authority also reduced the scope of work by deleting a requirement to construct handicap parking structures. The Housing Authority notified Fassberg of the change in January 2002, but did not reduce the contract price by $43,099.82 until October 2002. The Housing Authority in its closing argument identified no connection between any misrepresentation by Fassberg and the $43,099.82 reduction, and the record reveals no connection and no basis to recover that amount as damages for misrepresentation.
Finally, the $455,000 in wages due to workers does not reflect an actual loss or harm to the Housing Authority and therefore is not recoverable as damages, as explained in section 3.c., ante. Accordingly, we conclude that the evidence fails to establish a basis to recover any of the damages awarded by the jury for misrepresentation. Our conclusion also compels the conclusion that the punitive damages award must be reversed because punitive damages cannot be awarded without actual damages. (Mother Cobb's Chicken Turnovers, Inc. v. Fox (1937) 10 Cal.2d 203, 205, 73 P.2d 1185; Cheung v. Daley (1995) 35 Cal.App.4th 1673, 1676-1677, 42 Cal. Rptr.2d 164; see Kizer v. County of San Mateo (1991) 53 Cal.3d 139, 147, 279 Cal. Rptr. 318, 806 P.2d 1353 ["actual damages are an absolute predicate for an award of exemplary or punitive damages"].)

7. The Trial Court on Remand Must Determine Whether the Housing Authority is Precluded from Pursuing Damages for Misrepresentation

The effect of our reversal of the judgment in part is to place the parties in the position they were in before the case was tried with respect to those issues on which we reverse the judgment. (Weisenburg v. Cragholm (1971) 5 Cal.3d 892, 896, 97 Cal.Rptr. 862, 489 P.2d 1126; Hall v. Superior Court (1955) 45 Cal.2d 377, 381, 289 P.2d 431.) Accordingly, the Housing Authority may seek to recover compensatory and punitive damages for misrepresentation in the new trial on remand provided that such a recovery is not barred by its prior election of remedies.
*409 The election of remedies doctrine is based on equitable estoppel. (Pac. Coast Cheese, Inc. v. Sec-First Nat. Bank (1955) 45 Cal.2d 75, 80, 286 P.2d 353.) The doctrine generally holds that if a plaintiff elects a particular remedy in lieu of an alternative and inconsistent remedy and thereby gains an advantage to the detriment of the defendant, the plaintiff thereafter is precluded from pursuing the alternative remedy. (Steiner v. Rowley (1950) 35 Cal.2d 713, 720, 221 P.2d 9; Baker v. Superior Court (1983) 150 Cal.App.3d 140, 144-145, 197 Cal.Rptr. 480.) The doctrine applies only if the defendant suffered a substantial injury as a result of the plaintiffs initial election of remedies. (Pac. Coast Cheese, supra, at p. 80, 286 P.2d 353; Mansfield v. Pickwick Stages (1923) 191 Cal. 129, 131, 215 P. 389.) The election of remedies doctrine ordinarily does not preclude a plaintiff who has pled alternative remedies from changing his or her election before the defendant has suffered an injury from the prior election through the application of res judicata or a satisfaction of judgment. (Southern Christian Leadership Conference v. Al Malaikah Auditorium Co. (1991) 230 Cal.App.3d 207, 223, 281 Cal.Rptr. 216.)
Whether the facts establish an equitable estoppel is a question for the trial court to decide in the first instance, unless the facts can support only one reasonable conclusion. (Platt Pacific, Inc. v. Andelson (1993) 6 Cal.4th 307, 319, 24 Cal. Rptr.2d 597, 862 P.2d 158.) Accordingly, we conclude that the trial court in the first instance should decide whether there was a binding election of remedies here, particularly when there is no evidence in the appellate record of events that occurred after the entry of judgment and therefore no factual basis for this court to determine whether Fassberg was prejudiced by the prior election of remedies.

8. The Court Properly Required an Election of Remedies with Respect to Punitive Damages

The Housing Authority in its appeal challenges the required election of remedies. The Housing Authority contends it is entitled to recover the compensatory damages for breach of contract, treble damages for false claims, civil penalty, and punitive damages. We conclude that the trial court correctly required an election of remedies.[27]
California courts have held that if a defendant is liable for a statutory penalty or multiple damages under a statute, the award is punitive in nature, and the award penalizes essentially the same conduct as an award of punitive damages, the plaintiff cannot recover punitive damages in addition to that recovery but must elect its remedy. (Troensegaard v. Silvercrest Industries, Inc. (1985) 175 Cal.App.3d 218, 226-228, 220 Cal.Rptr. 712 [civil penalty under Civ.Code, ง 1794]; Marshall v. Brown (1983) 141 Cal.App.3d 408, 419, 190 Cal.Rptr. 392 [treble damages under Lab. Code, ง 1054]; see Clauson v. Superior Court (1998) 67 Cal.App.4th 1253, 1256, 79 Cal.Rptr.2d 747 [stating that the plaintiffs must elect between statutory penalties or treble damages under Pen.Code, ง 637.2, subd. (a) and punitive damages]; Turnbull & Turnbull v. ARA Transportation, Inc. (1990) 219 Cal.App.3d 811, 826, 268 Cal. Rptr. 856 [treble damages under Bus. & *410 Prof.Code, ง 17082].) To impose both a statutory penalty or multiple damages award and punitive damages in those circumstances would be duplicative. (Troensegaard, supra, at pp. 227-228, 220 Cal. Rptr. 712; Marshall, supra, at p. 419, 190 Cal.Rptr. 392.) We presume that the Legislature did not intend to allow such a double recovery absent a specific indication to the contrary. (Troensegaard, supra, at p. 228, 220 Cal.Rptr. 712; see Hale v. Morgan (1978) 22 Cal.3d 388, 405, 149 Cal.Rptr. 375, 584 P.2d 512 [narrowly construing Civ.Code, ง 789.3 with regard to the amount of a civil penalty]; People ex rel. Lungren v. Superior Court (1996) 14 Cal.4th 294, 313-314, 58 Cal.Rptr.2d 855, 926 P.2d 1042 [discussing Hale].)
The Housing Authority contends the civil penalties and treble damages awarded under the California False Claims Act are compensatory in nature and therefore do not implicate these concerns. It cites Cook County v. United States ex rel. Chandler (2003) 538 U.S. 119, 123 S.Ct. 1239, 155 L.Ed.2d 247 (Cook County) and U.S. v. Mackby, supra, 339 F.3d 1013 for the proposition that some portion of the civil penalty and treble damages awardable under the federal False Claims Act is compensatory and remedial in nature, and argues that the same is true here.
Cook County, supra, 538 U.S. at page 134, 123 S.Ct. 1239 held that local governments were "person[s]" (31 U.S.C. ง 3729(a)) subject to liability under the federal False Claims Act. The plaintiff invoked the common law rule that municipalities are not subject to punitive damages unless expressly authorized by statute, and argued that the 1986 amendments to the federal act increasing the maximum damages from double to treble converted the provision from a remedial provision to a punitive one. (Cook County, supra, at pp. 129-130, 123 S.Ct. 1239.) The United States Supreme Court concluded that the term "person" in the federal act included local governments when the act was first enacted in 1863 and that the 1986 amendments did not implicitly repeal that definition or redefine the term to exclude municipalities. (Id. at pp. 130, 132-133, 123 S.Ct. 1239.) The Supreme Court acknowledged its previous characterization of the treble damages provision in the federal act as "essentially punitive in nature" (Vermont Agency of Natural Resources v. United States ex rel. Stevens (2000) 529 U.S. 765, 784, 120 S.Ct. 1858, 146 L.Ed.2d 836),[28] but stated that the punitive nature of treble damages did not overcome the presumption against repeal by implication. (Cook County, supra, at p. 130, 123 S.Ct. 1239.) Cook County stated that treble damages serve "remedial purposes in addition to punitive objectives" and that the line between the two "defies general formulation, *411 being dependent on the workings of a particular statute and the course of particular litigation." (Ibid.)
Cook County, supra, 538 U.S. at page 130, 123 S.Ct. 1239 explained that "some liability beyond the amount of the fraud" usually is necessary to compensate the government for "`the costs, delays, and inconveniences occasioned by fraudulent claims.' [Citations.]." (Id. at p. 130, 123 S.Ct. 1239.) Cook County noted that a qui tarn relator can recover as much as 30 percent of the treble damages, and stated that even absent a qui tam relator, some liability in excess of actual damages may be necessary to compensate the government for prejudgment interest and consequential damages that the federal act does not expressly authorize. (Id. at p. 131, 123 S.Ct. 1239.) The Supreme Court stated further, "Thus, although Stevens recognized that the FCA's treble damages remedy is still `punitive' in that recovery will exceed compensation in a good many cases, the force of this punitive nature in arguing against municipal liability is not as robust as if it were a pure penalty in all cases." (Id. at pp. 131-132, 123 S.Ct. 1239.)
We need not decide categorically whether the recovery of treble damages and a civil penalty under the California False Claims Act precludes the recovery of punitive damages on a common law cause of action arising from the same conduct in all cases. Instead, we focus on the nature of the awards in this case (see Cook County, supra, 538 U.S. at p. 130, 123 S.Ct. 1239) to determine whether the treble damages award and civil penalty included sufficient amounts serving a punitive objective so as to render an additional award of punitive damages a prohibited double recovery under California law. Because there was no qui tam relator entitled to a significant portion of the treble damages award, we conclude that most of the treble damages award here served a punitive rather than a compensatory purpose. Moreover, particularly in light of the treble damages award, we conclude that the additional civil penalty served primarily a punitive purpose. Considering the amount of the civil penalty ($1,491,500) relative to the amount of the Housing Authority's purported actual damages resulting from false claims ($455,000), together with our conclusion that the majority of the treble damages award served a punitive purpose, we are compelled to conclude that the aggregate punitive portion of the treble damages award and civil penalty is sufficiently large that any additional award of punitive damages would be duplicative and unwarranted.[29]

9. Fassberg Is Entitled to Recover the Retention Proceeds

The right to a setoff is "founded on the equitable principle that `either party to a transaction involving mutual debts and credits can strike a balance, holding himself owing or entitled only to *412 the net difference, ...' [Citation.]" (Granberry v. Islay Investments (1995) 9 Cal.4th 738, 744, 38 Cal.Rptr.2d 650, 889 P.2d 970.) "[I]t is well settled that a court of equity will compel a set-off when mutual demands are held under such circumstances that one of them should be applied against the other and only the balance recovered." (Harrison v. Adams (1942) 20 Cal.2d 646, 648, 128 P.2d 9.) Code of Civil Procedure section 431.70 describes the procedure to be followed in raising setoff as a defense.[30] (Granberry, supra, at p. 744, 38 Cal. Rptr.2d 650, 889 P.2d 970.) Fassberg did so here, and both parties sought affirmative relief to determine the parties' rights and duties with respect to the retention proceeds.
Whether a setoff is appropriate in equity is a question within the trial court's discretion. We review the court's decision under the abuse of discretion standard. (Wm. R. Clarke Corp. v. Safeco Ins. Co. of America (2000) 78 Cal.App.4th 355, 359, 92 Cal.Rptr.2d 709.) An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason' and results in a miscarriage of justice. (Shamblin v. Brattain, supra, 44 Cal.3d at pp. 478-479, 243 Cal.Rptr. 902, 749 P.2d 339; Denham v. Superior Court, supra, 2 Cal.3d at p. 566, 86 Cal.Rptr. 65, 468 P.2d 193.)
The Housing Authority agreed under the terms of the contract to release the retention proceeds after its final acceptance of the work upon receipt of a release of all claims against the Housing Authority arising by virtue of the contract.[31] Such a provision in a public works contract provides a measure of security to the public agency, encourages the prompt release of claims against the agency, and discourages unfounded lawsuits. The present litigation will resolve all disputes between the parties arising out of the contract work. There is no valid reason for the Housing Authority to continue to withhold the retention proceeds after the entry of judgment in this case.
The trial court denied a setoff and stated that Fassberg must commence "a separate equitable action" to recover the retention proceeds. The court decided that the issue raised by the pleadings was limited to the question submitted to the jury as to whether the Housing Authority was entitled to withhold the retention proceeds more than 60 days after the date of completion, in light of the parties' dispute (Pub. Contract Code, ง 7107, subd. (c)). The court stated that to the extent Fassberg was seeking to reduce the judgment by the amount of the retention proceeds, Fassberg failed to properly raise the issue either at trial or in a posttrial motion. The court concluded that Fassberg's motion to vacate the judgment, motion for partial judgment notwithstanding the verdict, *413 and new trial motion were procedurally limited and did not allow the requested relief. The court stated further, "Assuming arguendo that the instant motion is a proper post-judgment motion for an equitable offset, the court denies the motion. Fassberg's requested relief would require an evidentiary trial in the guise of a post-trial motion, involving additional evidence, a determination of how much of the retention (if any) HACLA owes now or might owe in the future, and the rendering of a decision. That determination, if appropriate at all, is more properly made in a separate action by Fassberg for an equitable set-off."
In our view, there is no particular procedure required to invoke the equitable power of the court to effect a setoff, when appropriate. Fassberg in its posttrial motions clearly stated that it sought to reduce the judgment against it by the amount of the retention proceeds that the Housing Authority continued to withhold. The evidence at trial established that the Housing Authority continued to withhold $1,310,036.47 in retention proceeds. The Housing Authority does not dispute that it continues to withhold that amount. Contrary to the decision of the trial court, we hold that no additional evidence or further proceedings are necessary to determine how much of that amount the Housing Authority must return to Fassberg. The Housing Authority has no right to continue to withhold any part of the retention proceeds after this action is fully resolved and must return all of the retention proceeds to Fassberg in the amount of $1,310,036.47. Therefore, the denial of a setoff was error. Fassberg is entitled to recover the full amount of the retention proceeds in the judgment to be entered after further proceedings on remand. In light of our conclusion, the trial court on remand must reconsider its determination that the Housing Authority is the prevailing party for purposes of an attorney fee award under Public Contract Code section 7107, subdivision (f).

10. The Denial of the Housing Authority's Motion for Expert Witness Fees Based on the Statutory Offer to Compromise Was Error

Code of Civil Procedure section 998 establishes a procedure to shift costs if a party fails to accept a reasonable settlement offer before trial. The purpose of the statute is to encourage pretrial settlements. (T.M. Cobb Co. v. Superior Court (1984) 36 Cal.3d 273, 280, 204 Cal.Rptr. 143, 682 P.2d 338.) Section 998 provides that if a plaintiff fails to accept a written offer to compromise by a defendant and fails to obtain a more favorable judgment, the plaintiff cannot recover its postoffer costs and must pay the defendant's costs incurred after the offer. (Id., subd. (c)(1).) In addition, the court in those circumstances, in its discretion, may order the plaintiff to pay the defendant's expert witness fees "actually incurred and reasonably necessary" for trial and trial preparation. (Ibid.) A judgment is more favorable to the plaintiff than a prior settlement offer only if the value of the plaintiffs recovery in the judgment, exclusive of the plaintiffs postoffer costs, exceeds the value of the offer. (Id., subd. (c)(2)(A).)
An offer to compromise under Code of Civil Procedure section 998 must be sufficiently specific to allow the recipient to evaluate the worth of the offer and make a reasoned decision whether to accept the offer. (Berg v. Darden (2004) 120 Cal.App.4th 721, 727, 15 Cal.Rptr.3d 829; Taing v. Johnson Scaffolding Co. (1992) 9 Cal.App.4th 579, 585, 11 Cal.Rptr.2d 820.) Any nonmonetary terms or conditions must be sufficiently certain and capable of valuation to allow the court to determine *414 whether the judgment is more favorable than the offer. (Barella v. Exchange Bank (2000) 84 Cal.App.4th 793, 801, 101 Cal.Rptr.2d 167; Valentino v. Elliott Sav-On Gas, Inc. (1988) 201 Cal.App.3d 692, 697-698, 247 Cal.Rptr. 483 (Valentino).) Ascertaining the terms of an offer, including the determination whether the offer is sufficiently specific and certain for purposes of section 998, is a question involving the interpretation of a writing. We independently interpret a writing if the interpretation does not turn on the credibility of extrinsic evidence. (Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 402 P.2d 839; Winet v. Price (1992) 4 Cal.App.4th 1159, 1166, 6 Cal.Rptr.2d 554; see Berg, supra, at p. 726, 15 Cal.Rptr.3d 829 [determined de novo whether a section 998 offer to compromise was sufficiently specific]; Elite Show Services, Inc. v. Staffpro, Inc. (2004) 119 Cal.App.4th 263, 268, 14 Cal.Rptr.3d 184 [same].)
The Housing Authority offered in writing to pay Fassberg $1,100,000 in exchange for the entry of mutual requests for dismissal with prejudice of the entire action and the execution, of a proposed Settlement Agreement and Mutual Release. The proposed agreement included a release by Fassberg stating: "Fassberg, for itself and on behalf of its antecedents, successors, assigns, ... does hereby fully release, discharge, relinquish, acquit and covenant not to sue HACLA and' their successors, assigns, ... from all claims, disputes and liabilities arising from, relating or in any way pertaining to the subject matter of the Action including any actual or alleged breach of contract, any actual or potential claim and all disputes arising from or relating to (a) the Action, (b) any and all demands, executions, setoffs, debts, expenses, legal costs, attorneys' fees, interest, sums of money and/or losses of any kind whatsoever, and (c) any and all damages (including without limitation compensatory, punitive, exemp
lary or statutory) or any other legal or equitable relief, right or obligation existing between the Parties, now, forever and for all time...." At the first ellipsis in the quoted passage were four lines of text listing various persons and entities related to Fassberg, and at the second ellipsis was a similar list of persons and entities related to the Housing Authority. The agreement also included a waiver of the provisions of Civil Code section 1542.
The trial court concluded that the proposed release was overbroad because it (1) required Fassberg to release not only its own claims but also those of "a long list of other possible, ill-defined third parties"; (2) encompassed not only claims against the Housing Authority but also claims against "a long list of other possible, ill-defined third parties"; and (3) encompassed all possible claims pertaining to those third parties that could have been alleged in this case. The court stated, "it is impossible for the court to evaluate the offer to compromise without having to consider a range of possible parties and claims extrinsic to the parties and claims that were actually present in the instant case." The court therefore denied the motion for expert witness fees, citing Valentino, supra, 201 Cal.App.3d 692, 247 Cal.Rptr. 483.
Valentino, supra, 201 Cal.App.3d 692, 247 Cal.Rptr. 483 involved a personal injury lawsuit by an individual against the owner of a gasoline service station. The defendant offered to pay $15,000 in exchange for a dismissal of the action and a release of all claims arising out of the plaintiffs claims. The release extended not only to the defendant but also to the defendant's attorneys and insurance carrier. (Valentino, supra, at pp. 694-695, 247 Cal.Rptr. 483.) The plaintiff obtained a *415 judgment against the defendant in the amount of $9,750. The trial court concluded that the judgment was less favorable to the plaintiff than the settlement offer and therefore denied the plaintiffs motion for costs and awarded the defendant its costs pursuant to the version of Code of Civil Procedure section 998 then in effect. (Valentino, supra, at pp. 695-696, 247 Cal. Rptr. 483.)
The Court of Appeal concluded that the offer must be evaluated in light of all of its terms and conditions, including the release. (Valentino, supra, 201 Cal.App.3d at p. 697, 247 Cal.Rptr. 483.) Valentino stated that because the release extended to the defendant's insurer, it encompassed the plaintiffs potential claims against the insurer, including bad faith and violation of Insurance Code section 790.03. (Valentino, supra, at p. 695, 247 Cal.Rptr. 483.) Valentino determined that the value of a potential bad faith claim at the time of the offer was at least $5,250, the difference between the $15,000 offer and the $9,750 judgment, and therefore concluded that the judgment was more favorable to the plaintiff than the settlement offer. (Id. at pp. 698-699, 247 Cal.Rptr. 483.) Valentino also stated that to identify all of the potential claims to be released against the defendant, insurer, and attorney and determine their aggregate value was an impossible task. (Id. at pp. 699-700, 247 Cal.Rptr. 483.) Valentino stated further: "Even if it were possible, it would not be worth the cost. Recalling the underlying purpose of section 998 is to promote judicial economy, this court is not about to encourage defendants to add conditions to their statutory offers which introduce so much uncertainty to those offers the courts must spend hours or days sorting them out to determine whether plaintiffs have achieved a more favorable result at trial." (Id. at pp. 700-701, 247 Cal.Rptr. 483.)
We agree in principle that a defendant's settlement offer may include terms or conditions, apart from the termination of the pending action in exchange for monetary consideration, that make it exceedingly difficult or impossible to determine the value of the offer to the plaintiff. In those circumstances, a court should not undertake extraordinary efforts to attempt to determine whether the judgment is more favorable to the plaintiff. Instead, the court should conclude that the offer is not sufficiently specific or certain to determine its value and deny cost shifting under Code of Civil Procedure section 998. (Berg v. Darden, supra, 120 Cal.App.4th at p. 727, 15 Cal.Rptr.3d 829; Barella v. Exchange Bank, supra, 84 Cal.App.4th at p. 801, 101 Cal.Rptr.2d 167; Taing v. Johnson Scaffolding Co., supra, 9 Cal.App.4th at pp. 585-586, 11 Cal.Rptr.2d 820; Valentino, supra, 201 Cal.App.3d at pp. 697-698, 247 Cal.Rptr. 483.) We conclude, however, that the proposed release here was not overbroad.
The proposed settlement and mutual release agreement identifies only two parties to the proposed agreement: the Housing Authority and Fassberg. It describes the "subject matter" of the dispute as "[a]ny and all claims, causes of action, matters alleged or which could have been alleged in [this action], including the cross-complaint by the Housing Authority," excluding only any claim by the Housing Authority based on a latent defect. We construe this language as an attempt to define the subject matter of the settlement and release to encompass the whole of the action, with only the stated exception. The release provision, quoted ante, states that Fassberg fully releases the Housing Authority from all claims arising from or relating to the subject matter of this action, including certain specified claims. We view the statement that Fassberg releases those *416 claims "on behalf of its" numerous related persons and entities as an attempt to identify any persons and entities whose potential claims may derive from or otherwise depend on the claims of Fassberg in this action, to ensure that those claims and potential claims are fully extinguished. Similarly, we view the reference to the release of claims against numerous persons and entities related to the Housing Authority as an attempt to identify any persons and entities whose potential liability may derive from or depend on that of the Housing Authority in this action. This type of language is typical of many releases, although the release here is particularly exhaustive, and in our view does not render the release uncertain for purposes of Code of Civil Procedure section 998, Absent some indication of the existence of a valuable claim in favor of a related person or entity, independent of Fassberg's actual and potential claims arising from the subject matter of this action, that would be extinguished by the release, we conclude that the release is not overbroad or incapable of valuation.
Fassberg urges us to affirm the denial of the motion for expert witness fees under Code of Civil Procedure section 998, arguing that the settlement offer was not made in good faith because the Housing Authority had no reasonable expectation that Fassberg would accept the offer. Many courts have concluded that a good faith requirement is implicit in section 998 and that an unreasonably low settlement offer by a defendant cannot justify cost shifting under the statute. (E.g., Jones v. Dumrichob (1998) 63 Cal.App.4th 1258, 1262-1263, 74 Cal.Rptr.2d 607; Elrod v. Oregon Cummins Diesel, Inc. (1987) 195 Cal.App.3d 692, 698-700, 241 Cal.Rptr. 108.) Whether a settlement offer was reasonable and made in good faith is question within the sound discretion of the trial court. (Elrod, supra, at p. 700, 241 Cal. Rptr. 108.) The court here denied the motion for expert witness fees for another reason, did not deny the motion on the ground that the offer was unreasonable and in bad faith, and did not address that argument in its order.[32] The deferential abuse of discretion standard applies only if the trial Court actually exercised its discretion. If the record clearly shows that the court failed to exercise its discretion, as here, we can neither defer to an exercise of discretion that never occurred nor substitute our discretion for that of the trial court. (See Shamblin v. Brattain, supra, 44 Cal.3d at p. 478, 243 Cal.Rptr. 902, 749 P.2d 339 ["When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court"].) Accordingly, we can affirm the ruling based on a discretionary ground that the court did not rely on only if the record compels the conclusion that any other decision would be an abuse of discretion and that no additional evidence relevant to the decision could be presented on remand. (Cf. Pollitz v. Wickersham (1907) 150 Cal. 238, 251, 88 P. 911 ["Unless this court can satisfy itself from the record as to the ultimate rights of the parties, it will not undertake in reversing a judgment to finally settle the same"]; Paterno v. State of California (1999) 74 Cal.App.4th 68, 76, 87 Cal.Rptr.2d 754.) The Housing Authority's offer of $1,100,000 was a substantial amount in these circumstances, and we cannot conclude that the offer necessarily was unreasonable or in bad faith. *417 We conclude that the denial of the motion for expert witness fees was error. Our conclusion does not compel the conclusion that the Housing Authority is entitled to recover its expert witness fees, but only that the trial court on remand must exercise its discretion under Code of Civil Procedure, section 998, subdivision (c)(1) in deciding whether to award the fees.

DISPOSITION
The judgment is affirmed as to the denial of relief to Fassberg on the complaint. The judgment is reversed as to the cross-complaint by the Housing Authority with directions to the superior court to (1) conduct a new trial on the cross-complaint limited to determining the number of false claims, if any, the amount of damages resulting from false claims and from any false records or statements in connection with false claims, and the appropriate civil penalty; (2) determine whether the election of remedies doctrine precludes the Housing Authority from seeking to recover in the new trial compensatory and punitive damages for misrepresentation and, if the Housing Authority is not precluded, conduct a new trial on those issues; (3) include in the judgment on the cross-complaint to be entered at the conclusion of the proceedings on remand a reduced award of damages to the Housing Authority for breach of contract in the amount of $701,282.05 ($1,104,000โ$402,717.95 = $701,282.05), and an award to Fassberg of $1,310,036.47 as the full amount of the retention proceeds; (4) reconsider its determination that the Housing Authority is the prevailing party for purposes of an attorney fee award under Public Contract Code section 7107, subdivision (f); and (5) reconsider the issue of the Housing Authority's right to recover expert witness fees under Code of Civil Procedure, section 998, subdivision (c)(1). The order denying Fassberg's motion for partial judgment notwithstanding the verdict is affirmed. Each party shall bear its own costs on appeal.
KLEIN, P.J., and ALDRICH, J., concur.
NOTES
[1] Fassberg submitted change order proposals numbered 1 through 224 in addition to revisions of several of the change order proposals.
[2] Fassberg submitted change order proposals for which the Housing Authority never issued a written change order requesting a total of $1,630,783.82. The Housing Authority determined that only $402,717.95 was due for those change order proposals. The $402,717.95 figure does not reflect a credit of $677,932.77 claimed by the Housing Authority for other changes in the scope of work, that is, deductive change order proposals by the Housing Authority.
[3] Public Contract Code section 7107, subdivision (c) states in relevant part, "Within 60 days after the date of completion of the work of improvement, the retention withheld by the public entity shall be released. In the event of a dispute between the public entity and the original contractor, the public entity may withhold from the final payment an amount not to exceed 150 percent of the disputed amount."
[4] The court concluded that the $1,559,000 awarded for intentional and negligent misrepresentation included both $1,104,000 awarded for breach of contact and $455,000 awarded for false claims.
[5] "In the event that retention payments are not made within the time periods required by this section, the public entity or original contractor withholding the unpaid amounts shall be subject to a charge of 2 percent per month on the improperly withheld amount, in lieu of any interest otherwise due. Additionally, in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to attorney's fees and costs." (Pub. Contract Code, ง 7107, subd. (f).)
[6] A court has the discretion to award less than treble damages (but not less than double damages) in some circumstances. (Gov. Code, ง 12651, subd. (b).)
[7] "Any person who commits any of the following acts shall be liable to the state or to the political subdivision for three times the amount of damages which the state or the political subdivision sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state or political subdivision for a civil penalty of up to ten thousand dollars ($10,000) for each false claim: [ถ] (1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval. [ถ] (2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision." (Gov.Code, ง 12651, subd. (a).)
[8] Government Code section 12650, subdivision (b)(1) states that, for purposes of the California False Claims Act: "`Claim' includes any request or demand for money, property, or services made to any employee, officer, or agent of the state or of any political subdivision, or to any contractor, grantee, or other recipient, whether under contract or not, if any portion of the money, property, or services requested or demanded issued from, or was provided by, the state (hereinafter `state funds') or by any political subdivision thereof (hereinafter `political subdivision funds')."
[9] "Any person who commits any of the following acts shall be liable to the state or to the political subdivision for three times the amount of damages which the state or the political subdivision sustains because of the act of that person. A person, who commits any of the following acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state or political subdivision for a civil penalty of up to ten thousand dollars ($10,000) for each false claim." (Gov.Code, ง 12651, subd. (a), italics added.)
[10] The federal False Claims Act describes seven prohibited "acts," including knowingly presenting or causing to be presented "a false or fraudulent claim for payment or approval," and knowingly making or using or causing to be made or used "a false record or statement to get a false or fraudulent claim paid or approved." (31 U.S.C. ง 3729, subd. (a)(1), (2).) The federal act also authorizes a civil penalty and treble damages, but does not expressly state that a civil penalty may be imposed only "for each false claim." Section 3729(a) states, "Any person who [commits any of the seven enumerated acts] is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act...." In light of the different statutory language, federal authorities are not particularly helpful with respect to the proper construction of the California statute.
[11] LeVine v. Weis, supra, 90 Cal.App.4th 201, 108 Cal.Rptr.2d 562 also held that the public school was a "person" subject to liability for violation of Government Code section 12653, subdivision (b), consistent with a prior opinion by the Court of Appeal in the same case (LeVine v. Weis (1998) 68 Cal.App.4th 758, 80 Cal.Rptr.2d 439). The California Supreme Court, in Wells v. One2One Learning Foundation, supra, 39 Cal.4th at page 1197, 48 Cal. Rptr.3d 108, 141 P.3d 225, disapproved both of the LeVine opinions on that point.
[12] Any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved" (Gov.Code, ง 12651, subd. (a)(2)) is liable to the state or political subdivision for treble damages and may be liable for a civil penalty "for each false claim" (id., ง 12651, subd. (a)).
[13] The jury found that the Housing Authority suffered $455,000 in damages resulting from 2,983 false claims. Our conclusion that the of false claims was inflated does not necessarily compel the conclusion that the damages award was excessive, however, because Government Code section 12651, subdivision (a) provides for treble damages not only for each "false claim" but also for each "false record or statement to get a false claim paid or approved" (ibid.). We discuss the award of damages for false claims in section 3, post.
[14] The United States Supreme Court in Marcus stated, "This fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the [federal public agency] into the joint fund for the benefit of respondents." (U.S. ex rel. Marcus v. Hess, supra, 317 U.S. at p. 543, 63 S.Ct. 379.)
[15] We reject the Housing Authority's argument that Fassberg invited any error with respect to the number of false claims by failing to object to a jury instruction that permitted the jury to conclude that acts other than requests or demands for money, property, or services constituted false claims. The Housing Authority acknowledges that Fassberg did not request the instruction, but argues that Fassberg had numerous opportunities to object to the instruction, yet failed to object at any time before the verdict. An error is invited only if the appellant induced the commission of error through its own conduct. (Norgart v. Upjohn Co. (1999) 21 Cal.4th 383, 403, 87 Cal.Rptr.2d 453, 981 P.2d 79.) The mere acquiescence in or failure to object to an instruction is not invited error. (Huffman v. Interstate Brands Corp. (2004) 121 Cal. App.4th 679, 706-707, 17 Cal.Rptr.3d 397.) Moreover, the giving of a jury instruction is deemed excepted to. (Code Civ. Proc., ง 647.)
[16] The actual sum of these figures is $1,150,914.59 rather than $1,159,014.60. Counsel cited in closing argument only the figures for liquidated damages and labor overcharges. The other figures either appeared in exhibits admitted in evidence or were stated in trial testimony.
[17] Exhibit 9044, a seven-page document entitled Final Labor Submission Analysis, listed change order proposals and itemized the amounts of "questionable charges," including wages. The exhibit included 11 columns of figures calculated in various combinations and headed, inter alia, "questionable labor charges," "questionable labor less equipment and misc. charges," "revised questionable labor," and "revised total questionable charges." At the end of each column was a total dollar amount. None of those totals was $45,882. Although Hostettler testified that the amount "overpaid on C.O.P. labor" was $45,882, that figure did not appear in exhibit 9044.
[18] The special verdict form asked, "Did Housing Authority wrongfully withhold all or part of Fassberg's contract retention?" The Housing Authority maintained that it was entitled to withhold the retention proceeds because of disputes as to certain potential liabilities (see Pub. Contract Code, ง 7107).
[19] Even Hostettler apparently confused the two exhibits. He initially stated that the $45,882 figure was based on the analysis in exhibit 9044, but on cross-examination appeared to state that the figure was based on exhibit 9047. Fassberg's counsel asked with respect to the $45,882 figure, "And that's based again on your review that we looked at, 9047?" Hostettler responded, "I can't remember. Yeah, the labor analysis."
[20] The Housing Authority also appears to argue in similar perfunctory fashion that it is entitled to recover as damages for false claims some portion of the amounts stated in change order proposals, which it characterizes as "948 undocumented and unevidenced claims for money" totaling $3,915,834. Apart from our conclusion that the change order proposals were not claims under the California False Claims Act, discussed ante, the Housing Authority has not shown how much of the amounts stated in the change order proposals it actually approved and paid, let alone how much it approved and paid in reliance on false statements.
[21] The Housing Authority argues in its respondent's brief, "Fassberg's false certifications were the key to the receipt of hundreds of thousands of dollars," and "The jury award of only $455,000 is only a fraction of the amounts that Fassberg received in reliance on false certifications."
[22] "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ.Code, ง 3333.) "Detriment is a loss or harm suffered in person or property." (Id.. ง 3282.)
[23] "Where an appellate court vacates a judgment for plaintiff with directions to enter a new judgment in a greater amount, the defendant may move for a new trial after entry of the new judgment. [Citations.] Where the appellate court directs entry of judgment in an amount less than the original judgment, the same rule obviously applies. The plaintiff should be given an opportunity to move for a new trial after entry of the new judgment. In both situations, a party who may have been satisfied with the original judgment may in reliance upon it refrain from seeking a new trial or appealing or may have had his motion for new trial denied on the ground that the original judgment was sufficiently favorable to him. The judgment directed by the appellate court is less favorable to him, and he should be permitted to determine whether to seek a new trial and to have a motion for new trial considered in the light of the new judgment." (Woodcock v. Fontana Scaffolding & Equip. Co., supra, 69 Cal.2d at pp. 459-460, 72 Cal.Rptr. 217, 445 P.2d 881.)
[24] Section 30(b) of the contract stated: "If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of the contractor, or (2) by the Contracting Officer's failure to act within the time specified (or within a reasonable time if not specified) in this contract an adjustment shall be made for any increase in the cost of performance of the contract (excluding profit) necessarily caused by such unreasonable suspension, delay, or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor or for which any equitable adjustment is provided for or excluded under any other provision of this contract."
[25] Schulze's analysis apparently was based on 560 days of compensable delay, rather than 779 days.
[26] Perhaps this is because Dugan inspected the property frequently for the purpose of ensuring the quality of construction and compliance with the contract.
[27] Separate and apart from the required election of remedies, the Housing Authority is not entitled to recover the punitive damages awarded by the jury because it failed to prove actual damages for misrepresentation, as discussed in section 6, ante. We discuss the election of remedies requirement nonetheless because the issue is likely to arise again on remand. (Civ.Code, ง 43.)
[28] The United States Supreme Court in Vermont Agency of Natural Resources v. United States ex. rel. Stevens, supra, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 held that a state was not a "person" subject to liability under the federal False Claims Act, relying in part on the presumption that a governmental entity is not liable for punitive damages. "[T]he current version of the FCA imposes damages that are essentially punitive in nature, which would be inconsistent with state qui tam liability in light of the presumption against imposition of punitive damages on governmental entities. [Citation.] Although this Court suggested that damage under an earlier version of the FCA were remedial rather than punitive [citation], that version of the statute imposed only double damages and a civil penalty of $2,000 per claim [citation]; the current version, by contrast, generally imposes treble damages and a civil penalty of up to $10,000 per claim [citation]. [Citation.] `The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers.' [Citation.]" (Id. at pp. 785-786, 120 S.Ct. 1858, fns. omitted.)
[29] The Ninth Circuit in U.S. v. Mackby, supra, 339 F.3d 1013 held that a judgment including a treble damages award and a civil penalty under the federal False Claims Act was not grossly disproportionate to the gravity of the offense and did not violate the Eighth Amendment excessive fines clause. Mackby concluded that a portion of both the treble damages award and the civil penalty was remedial and a portion was punitive, but did not decide how much of either was remedial or punitive. (Mackby, supra, at p. 1019 & fn. 3.) Similarly here, we need not decide precisely what portion of either the treble damages award or the civil penalty was punitive. Even if we assume arguendo that both the treble damages award and the civil penalty were compensatory or remedial in part, we conclude that the punitive portion of the judgment is sufficiently large so as to preclude an additional award of punitive damages under California law.
[30] "Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other...." (Code Civ. Proc., ง 431.70.)
[31] Section 27(i) of the contract stated: "The [public agency] shall make the final payment due the Contractor under the contract after (1) completion and final acceptance of all work, and (2) presentation of release of all claims against the [public agency] arising by virtue of this contract, other than claims, in stated amounts, that the Contractor has specifically excepted from the operation of the release. Each such exception shall embrace no more than one claim, the basis and scope of which shall be clearly defined. The amounts for such excepted claims shall not be included in the request for final payment."
[32] The trial court may address this ground when it rules on the motion for expert witness fees on remand, and nothing stated in this opinion is intended to influence the court's exercise of discretion in that regard.