Filed 3/28/22  Cazares v. Beckstoffer Vineyards XX, LP CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RENEE CAZARES et al. , Plaintiffs and Respondents, v. BECKSTOFFER VINEYARDS XX, LP, Defendant and Appellant. | A163078 (Napa County Super. Ct. No. 16CV000228) |

Following an earthquake in Napa, a dispute arose between a landlord and its tenants regarding the extent of damage to the building, and thus issues of repair, the upshot of which was the landlord declared the lease terminated.  The tenants sued the landlord, which successfully moved the matter to arbitration, which occurred in 2020.  Following seven days of hearing and several post-hearing briefs, the arbitrator found for the tenants on one of their five claims, that for breach of contract, and awarded them damages, attorney fees, and costs that were a fraction of what they sought.

The landlord moved to vacate the award on several bases including, as pertinent here, that the arbitrator failed to disclose certain documents and pleadings in two lawsuits in Los Angeles County, the first a 2004 lawsuit involving a construction company owned by the arbitrator and her husband,

1

the second a 2008 lawsuit in which it was alleged that the arbitrator had made a fraudulent conveyance. The trial court denied the landlord's motion in a comprehensive order, following which judgment was entered confirming the award. The landlord appeals, contending the court erred in not vacating the award—that the trial court got it wrong. Our de novo review leads to a contrary conclusion—that the trial court got it right. And we affirm the judgment.

**The Parties and the General Setting**

In 1999, plaintiffs and respondents Renee and Jose Cazares (plaintiffs) leased the ground floor of a building located at 1202 First Street, Napa, a two-story, unreinforced masonry building built in 1905, where plaintiffs operated a restaurant, Sushi Mambo. In April 2014, defendant and appellant Beckstoffer Vineyards XX, LP (Beckstoffer) purchased the building and assumed the Sushi Mambo lease, which at that point had 21 more months to run.

In August 2014, a magnitude 6.0 earthquake struck the city of Napa, causing extensive damage to numerous buildings, including 1202 First Street. Issues thereafter arose between plaintiffs and Beckstoffer as to paragraph 9 of the lease, entitled "Damage or Destruction," which paragraph defines " 'Premises Partial Damage' " to mean damage that can reasonably be repaired in six months or less, and " 'Premises Total Destruction,' " to mean "damage or destruction which cannot reasonably be repaired in six months or less from the date of the [destructive event.]" Under paragraph 9.1(b), the landlord must notify the tenant within 30 days whether a destructive event caused partial or total damage, i.e., whether repairing the damage will take more or less than six months. And if total destruction has occurred, the lease "shall terminate sixty (60) days following" the destructive event.

2

Various persons inspected the damage, following which Beckstoffer obtained one report that repairs would take a year and cost some $2 million. Another report projected completion of the repairs no earlier than May 2015, more than six months after the earthquake. So, representing that best available estimates would be that repairs would take nine to 12 months, by letter dated September 10 Beckstoffer invoked the "Premises Total Destruction" clause of the lease, and that the lease will terminate on October 23, 2014, sixty days after the earthquake.

**The Lawsuit and the Appeal**

In April 2016, plaintiffs filed a lawsuit in Napa County Superior Court, alleging five causes of action. Beckstoffer filed a petition to compel arbitration, and the trial court granted it in part, ordering arbitration of one of the five causes of action, which arbitration it ordered stayed. Beckstoffer appealed, and in July 2018 we filed our unpublished opinion reversing and remanding the case for further proceedings consistent with our opinion: *Cazares v. Beckstoffer Vineyards XX, LP* (Jul. 12, 2018, A150986) [nonpub. opn.].

**The Arbitration**

In January 2019, plaintiffs filed a claim in arbitration asserting five claims, for breach of contract, fraud and deceit, trespass to real property, trespass to personal property, and conversion. Following the rules and procedures of the American Arbitration Association (AAA), the parties ranked and/or struck various of the proposed arbitrators, the result of which was that the AAA appointed Wendy Fassberg to act as arbitrator, the circumstances of which are the heart of Beckstoffer's appeal and will be discussed in detail below.

3

The arbitration hearing was held over seven days in August 2020, prior to which the parties had filed pre-hearing briefs. Arbitrator Fassberg heard from 16 witnesses, 12 on behalf of plaintiffs and four on behalf of Beckstoffer, and numerous exhibits were introduced.[1] The parties submitted post-hearing briefs, and then supplemental briefs on a limited issue, following which, on November 2, Arbitrator Fassberg re-opened the hearing for further briefing on plaintiffs' claim for "tax neutralization damages" in connection with any compensatory damage award. Following receipt of that briefing, on November 16, the hearing was re-closed.

On December 8, Arbitrator Fassberg issued her award, 22 pages of discussion and analysis. Following descriptions of the procedural and factual background, the award analyzed in detail, two of plaintiffs' claims, beginning with their claim for breach of contract. Arbitrator Fassberg held for plaintiffs on that claim where, following an exhaustive discussion of the evidence, the arbitrator concluded as follows: "[Beckstoffer] failed to present any credible evidence to show that they had the necessary information before terminating [plaintiffs'] lease and demolishing the interior of the Premises so that there was no going back. In fact, as stated above, the evidence showed that [Beckstoffer] made no effort to actually secure that information within the required notification window, or at all. As of September 17, 2014, one week _after_ the Termination Letter, ZFA [Structural Engineers] send [*sic*] a letter to [Andy Beckstoffer] that included as one of its tasks defining 'project scope, prepare preliminary budget estimates, _project timeline_ and outline project process for Owner review.' [Citation.] Consequently, [Beckstoffer] failed to

---

[1] The parties devote many pages in their briefs setting forth their version of the facts developed at the arbitration. We see no need for any such detail here.

meet the requirement that they make a good faith effort to determine whether a [Premises Total Damage], or a [Premises Partial Damage] had occurred before terminating the Lease, thereby breaching their obligations under the Lease. [Beckstoffer] is therefore liable to [plaintiffs] for breach of contract."

As to the damages, Arbitrator Fassberg awarded plaintiffs $225,888, significantly less than sought. She also denied plaintiffs' claims for economic damages based on a lease extension and for pre-judgment interest, and also their non-economic damage claims for punitive damages and emotional distress, as well as their claim for tax neutralization. And on plaintiffs' claim for attorney fees, the arbitrator awarded $582,860, approximately 27.5 percent of the $1,936,951 they had sought.[2] Finally, on plaintiffs' claim for costs, she awarded $13,365, some 10 percent of the $127,249 claimed.

As to the plaintiffs' four other claims, the award specifically analyzed, and rejected, their claim for fraud and deceit. Concerning the remaining claims—trespass to real property, trespass to personal property, and conversion—the arbitrator concluded there was "insufficient evidence presented to sustain the stated causes of action. Moreover, at the close of the evidentiary hearing, in accordance with the claims asserted in [plaintiffs'] Closing Brief, these claims are no longer asserted and are therefore DENIED."

**Post-Award Proceedings**

On January 4, 2021, plaintiffs filed a petition to confirm the award.

On February 19, Beckstoffer filed its response to the petition. That same day it filed the pleading leading to the issue here, a motion to vacate

---

[2] Plaintiffs sought attorney fees of $768,470, plus a lodestar enhancement of $1,152,711, plus $15,770 paid to a prior attorney Paynter.

the award.  The motion to vacate asserted it was based on Code of Civil Procedure sections 1281.9, 1283.4, 1286.2, subdivision (a)(2), 1286.2, subdivision (a)(4), and 1286.2, subdivision (a)(6),[3] and asserted three grounds, only the first of which is pertinent here:  (1) "the arbitrator failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was aware, including without limitation matters that could cause a person aware of the facts to reasonably entertain a doubt that the arbitrator would be able to be impartial."[4]

The motion was accompanied by a lengthy memorandum of points and authorities; a declaration of Beckstoffer attorney Kevin Block (that with its attachments and exhibits comprised 318 pages); and a request for judicial notice, requesting notice of nine documents.  Mr. Block's declaration was only 15 short paragraphs of testimony, almost all of which referred to various exhibits pertaining to the arbitration.  Most significantly, Beckstoffer's request for judicial notice included a request to put before the court some specific records and pleadings from two cases filed in Los Angeles County, including the following:

(1) The corrected judgment entered on March 24, 2005 in the case of *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (Super. Ct. Los Angeles County, 2003, No. BC 290195), which case ultimately

---

[3] Hereafter, all undesignated statutory references are to the Code of Civil Procedure.

[4] The other grounds were that the arbitrator (1) "exceeded her powers by arbitrarily remaking the parties' contract and deciding a question that was not before her and that the award cannot be corrected without affecting the merits of the decision upon the controversy submitted" and (2) "failed to decide a question submitted to her, the decision of which is necessary to a determination of the controversy."

6

resulted in a published opinion in the Court of Appeal: *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720 (the Housing Authority lawsuit); and

(2) The second amended complaint filed in the 2008 case of *Fidelity and Deposit Company of Maryland v. Abraham Fassberg, et al* (Super. Ct. Los Angeles County, 2008, No. BC 389072) (the Fidelity lawsuit).

Mr. Block's declaration ended with these three paragraphs:

"I was unaware of litigation involving Wendy Fassberg and Fassberg Construction Company before I received Arbitrator Fassberg's award. I relied on the biographical information she provided to me via AAA and her representation that it was accurate and complete. It was only after receiving her award that I discovered the lawsuits described in defendant's motion to vacate. Had I known of the allegations against Fassberg beforehand, I would not have agreed to her appointment as arbitrator.

"In reviewing the docket of the Fidelity case, a copy of which is attached to defendant's request for judicial notice, I saw that it ended with a voluntary dismissal by Fidelity after two years of hard-fought litigation. I assumed that this reflected a settlement. To make sure, I called the lead attorney for Fidelity in the Fassberg case, David Veis, who confirmed that the case had settled. He did not have access to the settlement agreement, he said, because his office was closed due to the pandemic, but he recalled that the settlement agreement contained a confidentiality clause.

"I asked Mr. Veis if, without revealing any of the terms of the settlement, he could sign a declaration that the case had ended in a confidential settlement. He said he felt comfortable doing so. I drafted a declaration for him, a copy of which is attached to this declaration as Exhibit X. When I sent it to him for review, however, he refused to sign,

7

sending me the e-mail attached to this declaration as <u>Exhibit Y</u>. I then contact[ed] the second chair in the case, David Lynch, who refused to sign the declaration for the same reason as David Veis, as reflected in the e-mail attached as <u>Exhibit Z</u> to this declaration."

Nowhere in Mr. Block's declaration or, for that matter, anywhere else in the record, is there any evidence as to how he or Beckstoffer learned of the two cases—or when.

The essence of Beckstoffer's claim of non-disclosure by Fassberg begins with the AAA's providing a list of potential arbitrators that included Wendy Fassberg, whose biography describes her history as a real estate and construction attorney, specifically noting that she has been involved "on multiple levels" with real estate and construction projects and involved in "all manner of disputes." As noted, following the AAA rules and procedures, Fassberg was appointed, after which the parties received her arbitrator disclosure form in which she denied any knowledge of matters that (i) might cause a reasonable person to entertain doubts about her impartiality or (ii) would otherwise lead her to believe that her disqualification would further the interests of justice. And at the end of the form, she signed an arbitrator's oath that the biographical information provided to the parties is current, accurate, and complete.

This, Beckstoffer contends, was false in light of certain documents referred to in its request for judicial notice, which documents contained material that should have been disclosed, including the corrected judgment in the Housing Authority lawsuit. That lawsuit—not incidentally, involving Fassberg Construction, not Fassberg individually—began when the construction company sued the Housing Authority for breach of contract. The Housing Authority cross-complained for fraud, breach of contract, and breach

8

of the implied covenant of good faith and fair dealing, alleging that Fassberg Construction failed to complete work on numerous projects and submitted fraudulent claims for payment. (See *Fassberg Construction Co. v. Housing Authority of City of Los Angeles*, *supra*, 152 Cal.App.4th at pp. 730–731.) And, Beckstoffer's motion argued, the corrected judgment revealed that the jury awarded the Housing Authority almost $4 million in compensatory and punitive damages and penalties, which Fassberg was under a duty to disclose.

As to the second lawsuit, Beckstoffer's motion to vacate argued that Fassberg failed to disclose that between 2008 and 2010, she was a defendant in the Fidelity lawsuit, an action filed against her and her husband by a surety that had issued construction bonds on 13 construction projects for which Fassberg Construction was the general contractor. Focusing on the allegations in Fidelity's verified second amended complaint, Beckstoffer pointed out that Fidelity alleged that Fassberg submitted false financial statements to induce Fidelity to issue the bonds, and breached contracts of indemnity with Fidelity that she signed in her individual capacity to obtain the bonds; and that once Fassberg Construction's default became clear, Fassberg fraudulently conveyed over $10 million in personal assets to an offshore tax haven in order to place them beyond Fidelity's reach.

Fidelity sought a preliminary injunction in the lawsuit, in response to which Fassberg submitted a lengthy declaration, described in detail below. Suffice to say here that while Fassberg admitted she transferred some assets overseas, she denied any intent to defraud her creditors, claiming that asset transfers were motivated by an overseas investment strategy that she had been considering since 2002, various personal issues, and a desire for increased security for her assets after some $2 million was stolen from a

9

personal bank account in the United States. We cannot tell from the register of actions whether Fidelity's request for injunction was granted or denied, and Beckstoffer's papers are silent on the issue. What we do know is that in 2010 the Fidelity case was resolved on the eve of trial by confidential settlement.

On February 9, plaintiffs filed their opposition to the motion to vacate, and on February 19, Beckstoffer filed its reply, along with 10 pages of objections to plaintiffs' evidence.

The motion to vacate came on for hearing on February 26, prior to which the trial court had issued a tentative ruling denying the motion; and at the conclusion of the hearing, the court took the matter under submission. Later that day, the trial court filed its order denying the motion to vacate, rejecting all three of Beckstoffer's claims. It was a comprehensive nine-page single-spaced order that, as pertinent to the issue here, rejected Beckstoffer's claim of failure to disclose. Citing to, and quoting extensively from, *Haworth v. Superior Court* (2010) 50 Cal.4th 372 (*Haworth*), the trial court saw no connection between the claimed dishonesty and Fassberg's ability to be impartial, going on to note that disclosure requirements are designed to ensure lack of bias, not moral rectitude. The court added that, even if any past misconduct were to raise doubts about Fassberg's capacity for bias, there was no evidence that any actual bias occurred in this case, rejecting as "conjecture" Beckstoffer's suggestions as to how Fassberg's conduct as alleged in the Fidelity lawsuit could distort her view of Beckstoffer's alleged fraud and bad faith, adding that the lawsuit ended in a settlement, meaning that the allegations against Fassberg were "never proven." Finally, the court noted that the Fidelity lawsuit and the arbitration were "wholly unrelated": one a surety/fraudulent conveyance case, the other a lease dispute.

10

On March 1, plaintiffs refiled their petition to confirm the award. Beckstoffer filed brief opposition, and plaintiffs a brief reply. On April 28, the trial court entered judgment confirming the award, from which Beckstoffer filed its appeal.

## DISCUSSION

### Introduction

Beckstoffer makes one argument on appeal, that the award "should be vacated for corruption under Code of Civil Procedure section 1286.2 based on (1) the arbitrator's failure to disclose serious and credible allegations of dishonesty against her and (2) her active concealment of those allegations by signing a false arbitration oath." Beckstoffer argues that failure to disclose a matter that must be disclosed constitutes "corruption" within the meaning of section 1286.2 (*O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1104; *Michael v. Aetna Life* (2001) 88 Cal.App.4th 925, 937), and requires that the award be vacated. (*Benjamin, Weill & Mazer v. Kors* (2011) 195 Cal.App.4th 40, 73.)

The trial court rejected the claim, which presents a mixed question of fact and law, with our review de novo. (*Haworth*, *supra*, 50 Cal.4th at pp. 384–385.) And that review leads us to reject the claim as well. It has no merit.

### The Law of Arbitrator Disclosure

Section 1281.9 requires a proposed arbitrator to disclose "all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial." (§1281.9, subd. (a).) This is the same standard set forth in the California Judicial Council Ethics Standards for Neutral Arbitrators (Ethics Standards), compliance with which is mandatory. (§1281.85, subd. (a).) "An arbitrator's

11

duty to disclose arises under the same circumstances that give rise to a judge's duty to recuse, that is, if '[f]or any reason . . . [¶] . . . [¶] . . . [a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial.' (§170.1, subd (a)(6)(A)(iii)." (*Haworth*, *supra*, 50 Cal.4th at pp. 388–389.)

Disclosure standards are intended to (a) inform and protect the parties to arbitration and (b) promote public confidence in the integrity of the arbitration system. (Ethics Standards, Standard 1, subd. (a).) As another Code of Ethics puts it, "Any doubt as to whether or not disclosure is to be made should be resolved in favor of disclosure." (American Bar Association Code of Ethics for Arbitrators in Commercial Disputes, Canon II, subsection D; AAA California Arbitrator Oath Form, page 1), which is perhaps why we have heard it said that the guidance given to arbitrators is "disclose, disclose, disclose."

Arbitrators are responsible for implementing the standards so as to promote and protect public confidence. (Ethics Standards, Standard 1, subd. (b).) Thus, some courts have noted that parties do not have an obligation to discover information, even public information, about an arbitrator that should have been disclosed. (*Mt. Holyoke Homes, L.P. v. Jeffer Mangels Butler & Mitchell, LLP* (2013) 219 Cal.App.4th 1299, 1313 (*Mount Holyoke*).) The obligation to make the required disclosure rests at all times with the arbitrator. (*Ibid.*)

The test to be applied for disclosure is an objective one, which "focuses on a reasonable person's perception of bias and does not require actual bias." (*Mount Holyoke*, *supra*, 219 Cal.App.4th at p. 1311) Put slightly differently, the question is not a subjective question of whether the arbitrator was actually biased, but whether an objective, reasonable person aware of the

12

facts reasonably could entertain a doubt that he or she could be impartial in the case. (*Haworth, supra*, 50 Cal.4th at pp. 385–386.)

As *Haworth* went on to describe, " ' [t]he "reasonable person" ' " under this test "is not someone who is 'hypersensitive or unduly suspicious, but rather is a "well-informed, thoughtful observer." ' [Citations.] '[T]he partisan litigant emotionally involved in the controversy underlying the lawsuit is not the *disinterested objective observer* whose doubts concerning the judge's impartiality provide the governing standard.' [Citations.] [¶] 'An impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased *for or against a party for a particular reason.*' " (*Haworth, supra*, 50 Cal.4th at p. 389.) In this context, " '[i]mpartiality' entails the 'absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind.' " (*Ibid.*) And, *Haworth* cautioned, a party raising the issue has a heavy burden to "clearly" establish the appearance of bias: The "appearance-of-partiality 'standard "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." ' " (*Ibid.*)

*Haworth* involved the arbitration of a battery and medical malpractice claim against a male doctor who performed cosmetic lip surgery on a female patient. The arbitrator issued an award for the doctor. The arbitrator, a retired judge, had been publicly censured 15 years before the arbitration for misconduct that included making suggestive remarks to female staff members, a fact not disclosed in his disclosure statement.

Based on that, Haworth moved to vacate the award. The trial court granted the motion, and the Court of Appeal denied the doctor's petition for mandamus. The Supreme Court reversed, holding that the award was not

13

subject to vacation under section 1286.2, subdivision (a)(6)(A) because the censure was not a matter that required disclosure under section 1281.9, subdivision (a) and the Ethics Standards for neutral arbitrators. (*Haworth, supra,* 50 Cal.4th at p. 377.) Doing so, the court rejected the argument that the censure would cause a person to reasonably conclude the arbitrator might be biased against a female plaintiff in a medical malpractice case involving cosmetic surgery. (*Id.* at p. 389.) In particular, the court noted, the conduct for which the former judge had been censured occurred some 15 years before the subject arbitration and did not involve litigants or take place while court was in session. The court also observed that the fact the former judge was censured rather than removed from office reflected the Supreme Court's view that his conduct did not indicate he could not be fair to female litigants generally. (*Id.* at p. 390.) And since possible inferences to be drawn from the censured conduct could point either in favor of the female patient or in favor of the male physician, the public censure "simply provides no reasonable basis for a belief that [the former judge] would be inclined to favor one party over the other in the present proceedings." (*Id.* at p. 391.)

Finally, the Supreme Court highlighted the importance of a subject matter link between the current arbitration and the matter claimed to be subject to disclosure, noting that "the subject matter of this arbitration was not such that the circumstance of gender was material, or that gender stereotyping was likely to enter into the decision made by the arbitrators." (*Haworth, supra,* 50 Cal.4th at p. 391.) " 'Judges, like all human beings, have widely varying experiences and backgrounds. Except perhaps in extreme circumstances, those not directly related to the case or the parties do not disqualify them.' [Citation.]" (*Id.* at p. 389.)

Applying those principles here leads to the conclusion that Fassberg did not violate the rules of disclosure.

**Fassberg Had no Duty to Disclose the Documents in the Prior Lawsuits**

In claimed support of its one argument, Beckstoffer has three bold-faced statements, the first of which is that "the allegations of fraud and bad faith . . . are serious, credible, and bear directly on the dispositive issue in the arbitration case." We begin by noting that we agree with Beckstoffer that the "allegations . . . are serious." That they are "credible" was never determined. And that they "bear directly on the dispositive issue" in the arbitration is hardly apparent, as neither case has any relationship whatsoever to any of the facts in the arbitration, no relation to any party to this action, and no connection with any of the attorneys or law firms involved in it.

As the trial court noted, what Beckstoffer refers to are "allegations," allegations made in the Fidelity lawsuit, a suit against Fassberg and her husband that had five causes of action, including for specific performance, breach of contract, indemnity, fraudulent transfer, and injunctive relief. As noted above, in opposition to Fidelity's request for a preliminary injunction, Fassberg submitted a lengthy, nine-page declaration testifying at length the reasons she claimed that led to the various transfers, the transfers Beckstoffer claimed were fraudulent. Those reasons began in 2002 or 2003, via a presentation to her and her husband about overseas investments. In early 2003 Fassberg's mother was diagnosed with cancer (she died in 2004); later in 2003 Fassberg's husband was diagnosed with leukemia. Then, in mid-2004, a "devastating experience occurred": their bank account was "ravaged," and "almost all of our funds—more than two million dollars were stolen." And so beginning in 2005, they began to fund the overseas trust. As noted also above, while we do not know whether Fidelity's request for

injunction was granted or denied, we do know that in 2010 the Fidelity lawsuit was settled. In short, there is much more to the allegations of fraudulent transfer than Beckstoffer would have it.

But Beckstoffer's reliance on the Fidelity lawsuit pales in comparison to its reliance on the corrected judgment in the Housing Authority lawsuit, which judgment awarded the Housing Authority a total of $3,960,500 on its cross-complaint following a jury verdict that the construction company breached its construction contract by submitting 2,983 false claims. That may have been the story in the trial court. It was not the end of the story.

Both sides appealed and the Court of Appeal reversed in great part, with most of its holding in favor of Fassberg Construction. These holdings included that: (1) the evidence did not support the finding of 2,983 false claims and did not establish a sufficient basis for the civil penalty; (2) the evidence did not support the finding that the Housing Authority suffered $455,000 in damages for false claims and did not support the treble damages award; (3) the damages awarded for breach of contract were excessive; (4) the award of compensatory damages for misrepresentation was not supported by substantial evidence; and (5) the construction company was entitled to recover retention proceeds. (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles*, *supra*, 152 Cal.App.4th at pp 768–769.)

In short, the argument Beckstoffer attempted to put before the trial court was based on a less than complete picture. Regardless, it does not demonstrate that Fassberg had a duty to disclose what Beckstoffer claimed she did. And Beckstoffer's arguments to the contrary, however vigorous, are unavailing.

In claimed support of its position, Beckstoffer uses strong language to describe Fassberg and her conduct. These three paragraphs are illustrative:

16

"In the eyes of a layperson, Fassberg's guilt, if she feels any, may predispose her to lash out and judge others' actions more harshly than her own, in an effort to minimize her own transgressions.  A layperson may reasonably conclude that if Fassberg believes she was wrongly accused, she may be moved to inflict similar injustice on others.

"Either way, a reasonable person could reasonably question whether Fassberg has the objectivity to pass judgment on what the duty of commercial good faith requires.  [Beckstoffer] need not prove whether or how the Fidelity trauma undermined Fassberg's objectivity, only that there is reason to question whether it did.

"Fassberg may have concluded [Beckstoffer's] witnesses were lying to cover up [Beckstoffer's] bad faith.  Based on the Fidelity allegations, a reasonable person could conclude that Fassberg perjured herself to evade her indemnity obligations.  A serial liar cannot judge impartially whether someone else lied, because the liar's judgment will inevitably be tainted by her own dishonesty."

While "serial liar" may be an easy label to throw around, such label appears belied by Fassberg's experience as described by the AAA:  "Thirty-six years as a real estate, construction, commercial, and business litigator, as well as a transactional practitioner in those specialties.  Owned and operated a property management company for many years and licensed real estate broker for over 21 years.  Arbitrated, mediated, as well as litigated countless landlord/tenant matters. . . .  Over the years, arbitrated and mediated disputes involving owners, developers, contractors, subcontractors, and design professionals, and have represented and served as in-house counsel for several of them.  Construction matters have involved all manner of disputes, including those ranging from fundamental to complex construction defect

17

claims, to delay claims, to breach of contract claims." Fassberg's background also includes membership in no fewer than five Bar Associations, service on numerous commissions and organizations, and the speaker/presenter on numerous education panels.

Beckstoffer also asserts a "reasonable person could also question whether Fassberg was biased in favor of the underdogs"—or, as Beckstoffer put it below, "the little guy." Beckstoffer describes how the lawsuit by Fidelity, "a large corporation," threatened the existence of Fassberg's family construction company and the loss of personal wealth. And, so the argument runs, Fassberg would have sympathy with plaintiffs on "an emotional level," awarding them compensation from a "wealthier defendant, regardless of the merits." Hardly.

As described in detail above, most of plaintiffs' claims were denied; the damages awarded were significantly less than they sought; their requests for attorney's fees and costs were slashed; their request for tax neutralization adjustment was refused; and their request for expert costs denied. If this is evidence of bias in favor of the "little guy," it comes in a novel guise.

Indeed, as plaintiffs point out, a fair reading of the situation is that Arbitrator Fassberg may have been biased in favor of someone sued for fraud as she was, and against which allegations she fought a vigorous defense, just as Beckstoffer fought hard against the allegations of fraud posed against it by plaintiffs. Again *Haworth* is apt: Even if we accept, *arguendo*, that allegations of dishonesty are sufficient to show a *capacity* for bias, there is no evidence presented here from which " 'one could reasonably form a belief that [the] arbitrator was biased for or against a party for a particular reason.' " (*Haworth*, *supra*, 50 Cal.4th at p. 389.) The situation "simply provides no

reasonable basis for a belief that [Fassberg] would be inclined to favor one party over the other in the present proceedings." (*Id.* at p. 391.)

On top of all that, another factor mentioned in *Haworth* is applicable here, the length of time some of the complained of conduct occurred. There it was 15 years after the public censure that the arbitration occurred. Here, it was 14 years from the corrected judgment in the Housing Authority lawsuit, 10 years from the second amended complaint in Fidelity.[5]

## DISPOSITION

The judgment is affirmed. Renee Cazares and Jose Cazares shall recover their costs on appeal.

---

[5] Beckstoffer makes the somewhat novel argument that Fassberg's appointment was procured by "fraud," apparently her non-disclosure of facts that should have been disclosed. This appears to be just another way of arguing what had to be disclosed, which we have rejected. Nothing more need be said.

19

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.

*Cazares v. Beckstoffer Vineyards XX, LP* (A163078)